**In re the Application of Philip Edward ROBINSON, Petitioner,**

**and**

**Kimberly Ann Robinson, Respondent,**

**and concerning Benjamin Philip Robinson and Stephanie Hazel Robinson, minor children.**

No. 97–WM–994.

United States District Court, D. Colorado.

Nov. 7, 1997.

Timothy E. Whitsitt, McFlynn, Pickett, Doremus & Whitsitt, Aspen, CO, for Petitioner.

Christopher Hardaway, Denver, CO, for Respondent.

## MEMORANDUM OPINION AND ORDER

MILLER, District Judge.

Philip Robinson petitioned this court for the return of his minor children, Benjamin and Stephanie, to Great Britain pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, December 23, 1981, 51 Fed.Reg. 10,494, 10,498 (1986) [hereinafter Convention], as implemented in the United States by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601–11610 (1994). The children's mother, Respondent Kimberly Robinson, removed them from Great Britain and they currently reside with her in Colorado.

The object of the Convention is to protect children from their wrongful removal from one country to another and to establish procedures for their prompt return to the "state of their habitual residence." Convention, Preamble, 51 Fed.Reg. at 10,498. Congress agreed, determining that wrongful removal was harmful to the children's well-being and that they should "be promptly returned unless one of the narrow exceptions set forth in the Convention applies." 42 U.S.C. § 11601.

As presented in this case, I must first determine the threshold question of whether the children were wrongfully removed and, if so, whether any "narrow exception" precludes an order of their prompt return.

### Factual Background

In 1979 Petitioner and Respondent were married in Aspen, Colorado, and moved to England soon thereafter where both children were born, Benjamin on November 6, 1986, and Stephanie on August 28, 1991. The family lived together in England until June 1995, when Mrs. Robinson and the children moved out of the family residence.

While separated, Mrs. Robinson applied to a local court for a restraining order against Mr. Robinson. The parties entered into a court approved "undertaking," in which Mr. Robinson agreed to vacate the home pending resolution of the issues between them. Although the undertaking did not address custody of the children, they remained with Mrs. Robinson. At the end of July 1995, and without the consent of Mr. Robinson, Mrs. Robinson brought the children to Aspen, Colorado, where they moved in with her father and step-mother.

That fall, Benjamin was enrolled in the third grade at Aspen Elementary, where Mrs. Robinson worked in the lunchroom part-time, and Stephanie began pre-school.

In January 1996 Mrs. Robinson and the children moved into their own apartment in Glenwood Springs, approximately 42 miles from Aspen. Despite the move, Mrs. Robinson continued to work and Benjamin finished the school year at Aspen Elementary. With the help of public assistance programs, Mrs. Robinson was eventually able to quit her job and begin college-level coursework emphasizing computers.

Since moving to Colorado, the children have participated in several extra-curricular activities. Benjamin started to play hockey, joined the Cub Scouts and Kampus Club, plays soccer, and briefly participated in the Aspen "Buddy" program. Stephanie belongs to the Brownies and regularly attends her brother's hockey games. Mrs. Robinson and the children frequently visit, or are visited by, her extended family and now attend church together. They have also received psychological counseling.

During this time, Mr. Robinson visited his family in Aspen in September 1995, but was unable to resolve matters with Mrs. Robinson. He next visited Colorado from July through September 1996. Since his return to England, he has exchanged some correspondence and maintained occasional phone contact with the children, but has not seen them.

### Removal or Retention

Petitioner must first prove by a preponderance of evidence that Respondent's removal was wrongful. 42 U.S.C. § 11603(e)(1)(A).

A removal is wrongful when (1) it violates the custody rights of the Petitioner under the country's law where the child "was habitually resident immediately before the removal"; and (2) Petitioner actually exercised those custodial rights (or would have but for the removal). Convention, art. 3, 51 Fed.Reg. at 10,498.

**1342**

There is no dispute but that the "habitual residence" at the time of removal was the United Kingdom. Hence, English law determines whether Petitioner had custody rights.

United Kingdom's law provides that, where, as here, the child's father and mother were married at the time of birth, each has "parental responsibility for the child." Children Act 1989, ch. 41, Part I, § 2(1). (Exhibit P–3). " 'Parental responsibility' means all the rights, duties, powers, responsibilities and authority which by law a parent of a child has in relation to the child and his property." *Id.* § 3(1). Thus, each parent has full custody rights unless altered by court order. Further, under the United Kingdom's Child Abduction Act 1984, it is a criminal offense for a parent to take a child out of the United Kingdom for more than one month without the consent of the other parent, again absent court order in favor of the first parent. Child Abduction Act 1984, ch. 37, Part I, § 1(1) (Exhibit P–2). Accordingly, both parents have on-going *de jure* custody of the child until a court of competent jurisdiction orders otherwise. *See* Aff. of Petitioner's English Solicitor (Exhibit P–11); *Friedrich v. Friedrich,* 78 F.3d 1060, 1064 (6th Cir.1996).

■ Nevertheless, Respondent argues that Petitioner's voluntary, Court approved "undertaking" not to communicate with the Respondent or return to the matrimonial home without her consent meant that Petitioner no longer had custody rights. Such an argument cannot stand the test of factual and legal scrutiny.

Supposedly as the result of alleged events, vigorously disputed by Petitioner, Respondent removed the children from the matrimonial home and then commenced injunction proceedings against Petitioner in the local county court in Great Britain. After hearing some of the evidence, the district judge suggested the matter be handled with an "undertaking" instead of a full hearing with a resulting formal order. No admissions of fact were made (Petitioner denied all allegations made by Respondent) and the resulting agreement or "undertaking" is in lieu of a court order. Aff. of Pet'r (Exhibit P–11). Indeed, a review of the "undertaking," (Exhibit R–1), discloses no agreement or mention of custody. Accordingly, I conclude that Respondent's argument is without merit as no court order exists to eliminate Petitioner's *de jure* custody rights.

■ Respondent goes even further, essentially arguing that, assuming Petitioner had custody rights, he failed to exercise them at the time of their removal as is otherwise required by Article 3 of the Convention. Given that Respondent used the threat of judicial authority to obtain the Petitioner's agreement to keep from the matrimonial home, converting his absence into a culpable failure to exercise custody rights must be summarily rejected.[1]

Accordingly, I conclude that the Respondent's removal of the parties children from the United Kingdom to Colorado was wrongful under the Convention and ICARA.

### Exceptions

Given the wrongful removal, the children should be returned "forthwith" (Convention, art. 12, 51 Fed.Reg. at 10,499) unless the Respondent shows, by the appropriate burden of proof, one of the following exceptions:

1. This proceeding was commenced more than one year after the removal and the children are "now settled in [their] new environment", *Id.*;

2. The Petitioner did not exercise custody rights or consented to or acquiesced in the removal, *Id.* art. 13(a), 51 Fed.Reg. at 10,499;

3. The children's return would expose them to grave risk of physical or psychological harm, *Id.* art. 13(b), 51 Fed.Reg. at 10,-499;

4. The children object to return and have attained the age and degree of maturity so that it is appropriate to take into account their views, *Id.*; and

5. Return of the children would not be permitted by the principles of the United States concerning protection of human rights

---

1. I agree with the Court in *Friedrich v. Friedrich* that the court should be wary of analyzing whether a parent has exercised his or her custo-dy rights as it indeed becomes "dangerously close to forbidden territory: the merits of the custody dispute" 78 F.3d at 1065.

and fundamental freedoms, *Id.* art. 20, 51 Fed.Reg. at 10,500.

At hearing, Respondent did not assert that the children's return would be at grave risk to them or violative of United States' principles of human rights and fundamental freedoms. Although Respondent made some argument that Petitioner was not exercising his custody rights or had acquiesced in the removal, an argument I reject, the real emphasis of her case was two pronged: that the children objected to being returned and, with more than one year having passed, they are now settled in their new environment. The Respondent has a burden of proving those exceptions by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2)(B).

*Consideration of Children's Objections*

Turning first to the children's objections, I was only presented evidence of what were really Benjamin's preferences. Benjamin, a month or two shy of his eleventh birthday, spoke with me in chambers outside the presence of counsel and his family. That experience only serves to underscore the wrenching pain of custody disputes and causes me to question the wisdom of allowing this difficult issue to be decided upon the wishes of a child—at least one this young.

However, the language of the Convention is plain. I have authority to not order the return if the child objects so long as his or her age and maturity are such that it is appropriate to take into account the child's views. Indeed, the commentary of Elisa Perez–Vera, official reporter of the session at which the Convention was adopted, notes that the child's view "may be conclusive." Elisa Perez–Vera, Explanatory Report by Elisa Perez–Vera, in 3 Actes et documents de la Quatorzieme session 426, 433 (1982) [hereinafter Perez–Vera Report]. Perez–Vera, apparently reflecting the intent of the contracting parties to the Convention, nevertheless notes that reliance on the child's view could be problematic. Indeed, he observed that "this provision could prove dangerous" in its application as the young people may "suffer serious psychological harm if they think they are being forced to choose between two parents." *Id.*

Similarly, the Legal Analysis of the Convention by the Department of State emphasized that it was important that use of the child's objection was discretionary "because of the potential for brain washing of the child by the alleged abductor. A child's objection to being returned may be accorded little if any weight if the court believes the child's preference is the product of the abductor parent's undue influence over the child." Public Notice 957, Hague International Child Abduction Convention; Text and Legal Analysis by the Department of State, 51 Fed.Reg. 10493, 10510 (1986) [hereinafter Public Notice 957].

This case bears out the legitimacy of those concerns. A reading of the record might justify a conclusion that an obviously intelligent young man of still tender age has a maturity which justifies giving weight to his views. But the dry record does not disclose tears coursing down the ruddy cheeks of a brave boy who was put in a difficult, if not impossible, position.

Reliance upon the objection makes some sense if the child is approaching 16 years of age—when the Convention is no longer applicable. Convention, art. 4, 51 Fed. Reg. at 10,498.[2] On the other hand, a 10–year old with maturity beyond his chronological age is still very much a child. Indeed, other courts have simply declared that the objection of one so young should not be considered. *Tahan v. Duquette,* 259 N.J.Super. 328, 335, 613 A.2d, 486, 490 (1992).

However, I need not decide the issue on that point. Not unrelated is whether the child's objection "is a product of the abductor parent's undue influence over the child." Public Notice 957, 51 Fed.Reg. at 10,510; *See Sheikh v. Cahill,* 145 Misc.2d 171, 546 N.Y.S.2d 517, 521—22 (1989).

■ It is likely that the abducting parent desperately desires to keep his or her child from leaving the country. It is unrealistic, indeed inhuman, to expect a caring parent not to influence the child's preference. Ac-

---

**2.** Perez-Vera opined that "it would be very difficult to accept that a child of, for example, 15 years of age, should be returned against its will." Perez–Vera Report at 433.

cepting that there will be some influence, the question really becomes when is it *undue*? I am sure the line is not always bright, but I am equally certain that it has been crossed in this case. The best evidence of that fact is Exhibit 24, a letter from the youngster to me which was suggested by the counselor, Karen Smith. Although initially portrayed as a way to express himself, the boy acknowledged that the counselor gave him "a few ideas." When asked what those were, he stated "just that I like it here and I'm *settled* in, yeah." (Emphasis added). His use of the term "settled" bespeaks influence. It is the most significant legal term of this dispute, yet, as discussed *infra*, it's of uncertain meaning.[3] Regardless, it is not the language of a ten-year old. I cannot escape the conclusion that, with the word being the keystone to Respondent's defense, the youngster was unduly influenced or pressured by the counselor and the Respondent (described by the counselor as a strong, positive influence).

Accordingly, I will not give the child's objection any weight as a separate defense to the Petition. I certainly sympathize with his difficult position. He doesn't want to leave his mother, but he also spoke with some fondness of friends in England, playing soccer and spending time with his father. Forcing a child to choose between parents may be the ultimate Hobson's choice, particularly when massive geographic or cultural differences separate the parents. I decline to impose that responsibility on this youngster.

### Are the Children Settled in a New Environment?

The only remaining defense to an order for return is whether the children are "now settled in [their] new environment," i.e. Glenwood Springs, Colorado. Convention, art. 12, 51 Fed.Reg. at 10,499. This exception is

applicable only if more than one year has elapsed from the wrongful removal before the date of commencement of these proceedings. *Id.* "Commencement of the proceedings" is defined as the initiation of these judicial proceedings, 42 U.S.C. § 11603(f)(3), which was May 14, 1997. The wrongful removal occurred in July, 1995, almost two years earlier. Without more,[4] therefore, the additional defense of "settled" is available to Respondent.

When are the children "settled"? Unfortunately, that term is not defined in the Convention or ICARA. Perez–Vera provides no real assistance other than to make clear that the issue is not a custody determination in the traditional sense.[5] The State Department's legal analysis gives a hint of substance by providing that the burden to resist an Order of Return because the child is allegedly settled in the new environment should require "nothing less than substantial evidence of the child's significant connections to the new country...." Public Notice 957, 51 Fed.Reg. at 10,509.

Nor is "settled" a legal term of art in my experience. It is not used in the Uniform Dissolution of Marriage Act (Colo.Rev.Stat. §§ 14–10–101 to 133 (1997)). The Uniform Child Custody Jurisdiction Act, (Colo.Rev. Stat. §§ 14–13–101 to 126 (1997)), which likewise makes no reference to the term "settled," does have the object of having custody matters decided in the state with the "closest connection and where significant evidence concerning [the child's] care, protection, training and personal relationships is most readily available ...." § 14–13–102(c). Interestingly, the State Department's reference to "significant connections" almost parallels the statutory language and, hence, at least provides a suggestion of meaning.

---

3. When asked to define "settled," the boy stated "Well, I like staying put here." That tends to confirm that he knew it was an important legal term to the Court and the parties.

4. Petitioner does argue that there should be some sort of tolling of the one year, equitable or otherwise, while negotiations for voluntary return of the children were being conducted. No authority is cited for that proposition and there is nothing in the record to justify a reliance for delay in filing.

5. Perez-Vera notes that the Convention avoided the potential pitfall of having subjective value judgments made on the "best interests of the child." Perez–Vera Report at 431. The Convention purposes are served when a return is ordered or when it is determined that the child is settled in the new environment. After that determination has been made then there may be "an examination of the merits of the custody rights ... which is outside the scope of the Convention." *Id.* at 458.

To fall back on general definitions is of little help other than as a post-decision rationalization.[6] Actually, Black's Law Dictionary concedes the lack of precision and provides sensible guidance: "Settled" is "[a] word of equivocal meaning; meaning different things in different connections, and the particular sense in which it is used may be explained by the context or the circumstances." BLACK'S LAW DICTIONARY 1372 (6th ed.1990).

■ Of course, the Convention and its purposes ultimately provide the context for meaning in this case. Without more, its object is the prompt return of wrongfully removed children. However, there are exceptions and the one relevant to the decision here is premised on the passage of time, namely at least one year. Although there is nothing magical about one year,[7] its basic purpose is designed to serve the best interests of the child which remain "of paramount importance in matters relating to their custody...." Convention, Preamble, 51 Fed.Reg. at 10,498. It would seem that, just as it is harmful to wrongfully remove the children from their habitual residence, it may also be harmful to remove them again if they have become connected to or "settled" in the new environment. However, it is not the mere passage of time which determines the issue or the Convention would have so provided.[8] Rather, there must also be evidence that the children are in fact settled in or connected to the new environment so that, at least inferentially, return would be disruptive with likely harmful effects. The Department of State says there must be "substantial evidence of the child's significant connections." Public Notice 957, 51 Fed.Reg. at 10,509.

Has the respondent provided such evidence here? Existing authorities do give us some handholds on the way to a decision consistent with the intended purpose of the Convention.

■ The first factor is simply the passage of time. If the action to return is promptly commenced, it is generally granted unless the abductor proves, *by clear and convincing evidence*, that return would involve grave risk of harm to the child or violate fundamental principles of the United States relating to human rights protection. Convention, arts. 13(b), 20; 42 U.S.C. § 11603(e)(2)(A).[9] On the other hand, if at least one year has passed then the abductor's task is much easier as he or she need only prove the settled status by a preponderance of the evidence.[10] That is only consistent with common sense: Prompt action for return seeks to remedy the harm of the original wrongful removal. As time passes a child becomes increasingly settled or connected to its new environment and delayed return may itself become the second harmful disruption.

A second important factor is the age of the children. Benjamin and Stephanie are old enough to allow meaningful connections to the new environment to evolve. On the other hand, children of a very young age are not. *See David S. v. Zamira S.*, 151 Misc.2d 630, 636, 574 N.Y.S.2d 429, 433 (1991) (holding that children 3 and 1 1/2 "are not yet involved in school, extracurricular, community, religious or social activities which children

---

**6.** See WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE, 1306 (1989 EDITION) which contains 30 different definitions including "to cause to take up residence" and "to take up residence in a new country or place," both of which justify a finding for the Respondent.

**7.** Perez-Vera discusses the importance of the role of a specific time limit and how, although the one year may be arbitrary, it serves an important watershed separating the required return of the child from allowing consideration of its best interests after it has been settled in a new environment. Perez–Vera Report at 458—59.

**8.** To simply provide some sort of rule, such as a presumption or otherwise, based solely on the passage of time would invite the person who wrongfully removed the child to hide out or avoid service of process.

**9.** This assumes that other possible defenses under Article 13 (failure to exercise custody rights or the child's objection) are not at issue.

**10.** Certainly, passage of time should not give advantage to the abductor who conceals the child or seeks to avoid process but that is not the case here. The uncontroverted testimony shows the Petitioner always knew the location of the children and, in fact, visited them in Colorado. Accordingly, there is no basis for some sort of equitable tolling to preclude the application of Article 12's terms. *See Wojcik v. Wojcik*, 959 F.Supp. 413, 420 (E.D.Mich.1997).

of an older age would be. The children have not yet formed meaningful friendships.").

██ With those factors in mind, there is significant, essentially undisputed, evidence that the children are settled in their new environment: they have lived in the same area for 22 months prior to commencement of action (5 months in Aspen with Respondent's father and then the balance in nearby Glenwood Springs); as exemplified by the testimony of Respondent's father and brother, the children have had active involvement with the Respondent's extended family; the children are doing well in school; and they are active participants in extracurricular matters such as Cub Scouts, Kampus Club, hockey and soccer. There is also evidence that, as healthy children usually do, they have made friends in school and elsewhere. In short, they have adjusted well to their new community.[11]

On the basis of this and other evidence, I conclude that the Respondent has established by a preponderance of the evidence that the children are settled in their new environment. *See Wojcik*, 959 F.Supp. at 420 (children are settled where they have lived in United States for 18 months, living first with mother's brother and then in a house on their own; both children attend school and church; and they have friends and relatives in the area).

It bears emphasis that this is not a determination of which is the best venue for their residence. The young man spoke of school, soccer and friends in the United Kingdom. Indeed, his description of a demanding school in England could well explain why he is a good student here (where, he states, school is easier because it has lower expectations of him). Nevertheless, the Convention has essentially decided that, once settled in the new

environment, to again uproot the children would be harmful. In that sense the ultimate best interests of the children are served by denying the petition. That is the best I can do under the Convention. Unfortunately, that does not ease the pain of loss or frustration of the caring parent.[12]

### Conclusion

For the foregoing reasons, the father's Petition for Return of the Children is denied and this matter is dismissed with prejudice. Each party shall pay his or her own costs and attorney fees.

---

11. Respondent also presented the testimony of Karen Smith, their professional counselor, that the children were well adjusted. This appears to have been a professional judgment rendered in the context of a custody determination under Colo.Rev.Stat. § 14–10–124(1.5)(d) which requires the court to consider "the child's adjustment to his home, school and community" when determining the best interests of the child in a custody dispute. Such professional judgment is normally entitled to some weight. However, because her objectivity was impaired by her ultimate advocacy, I gave her opinion little weight.

12. The Petitioner's own words express his pain better than the Court could ever suggest:

"I am a tired, beaten father. I have seen my children for six hours in the last two years. I burn in agony, adrift in space screaming in total silence with no one listening ... I feel as though Mother wants me to forget my only son and daughter as if they are not important to anyone but her, at the same time as holding this emotional gun to my head 6,000 miles away ... I have no brothers or sisters and now I have had my children taken away from me." Aff. of Pet'r ¶ 16.