**Alejandro G. ZUKER, Plaintiff,**

v.

**Patricia K. ANDREWS, Defendant.**

**Civil Action No. 97–12099–RCL.**

United States District Court,
D. Massachusetts.

April 10, 1998.

Alejandro G. Zuker, New York City, pro se.

Lucille R. DiPietro, Medford, MA, for Alejandro G. Zuker.

Thomas J. Barbar, Cambridge, MA, for Paticia K. Andrews.

Paticia K. Andrews, Watertown, MA, pro se.

### *OPINION AND ORDER CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER HEARING*

COLLINGS, United States Magistrate Judge.

### I. INTRODUCTION

Petitioner, Alejandro G. Zuker ("Zuker"), a citizen of Argentina,[1] seeks relief under The Hague Convention on the Civil Aspects of Child Abduction ("the Convention"), as implemented by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 et seq. He has filed an application with the United States Central Authority under The Hague Convention on the Civil Aspects of Child Abduction seeking the return of his child, Sasha, to Argentina. Sasha's mother, the respondent Patricia C. Andrews ("Andrews"), is a citizen of the United States.[2] She and the child reside in Watertown, Massachusetts. A Petition for Return of Child to the Petitioner (# 3) was filed in this Court on September 4, 1997. An evidentiary hearing was held on December 19, 1997.[3]

---

**1.** Zuker is also a permanent resident alien of the United States.

**2.** Zuker and Andrews never married.

**3.** Prior to the evidentiary hearing, the parties consented to have the case reassigned to the undersigned United States magistrate judge for

There is no dispute as to the times when Sasha and Andrews were in the United States and when they were in Argentina. Sasha was born in New York City on June 16, 1993. (Def.Exh.# 17) For a few weeks in April, 1994, Sasha and Andrews were in Argentina. From April to November, 1994, they were in New York City. From November, 1994 until May, 1995, they were in Argentina. From May, 1995 to November, 1995, they were in Waltham, Massachusetts residing at Andrews' mother's home. From November, 1995 to June, 1996, they were in Argentina. They left Argentina and arrived in New York on June 14, 1996. From June, 1996 until the present, Sasha has lived in Massachusetts with Andrews, first at his grandmother's home in Waltham and later at an apartment Andrews rented in Watertown. He has not returned to Argentina.

It is also not disputed that Andrews and Sasha went to Argentina in November, 1994 so that they could reside with Zuker while he worked on a planned Compact Disc ("CD") (Exh. # 8) and that Zuker worked on the production and marketing of the CD in Argentina at least through June, 1996 when Andrews and Sahsa returned to the United States. Zuker alleges that Andrews wrongfully retained the child in the United States in June 1997, a year after she and Sasha returned to the United States. (Exh. 3, p. 2) The Court's task is to decide what was the "habitual residence" of the child at the time when the alleged wrongful retention is said to have occurred. This task actually breaks down into resolving subsidiary issues.

The Court is not bound to accept Zuker's allegation that the wrongful retention occurred in June, 1997. The date of the retention is important because Article 12 of the Convention provides that if the Court finds that Sasha has been wrongfully retained and the filing of the petition in this Court ("the judicial authority of the Contracting State") occurred more than a year after the wrongful retention, the Court cannot order a return of the child if " . . . the child is now settled in its

[sic] new environment." Since the petition was filed on September 4, 1997, if the wrongful retention was more than a year prior to that date, the question of whether Sasha is now settled in his new environment would have to be resolved.

The date on which the alleged wrongful retention occurred is important from another perspective. Article 3 of the Convention provides, in pertinent part, that:

> The . . . retention of a child is to be considered wrongful where—
>
> (a) it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.[4]

Thus, the question with respect to "habitual resident" is tied to that period of time "immediately before" the retention. The date of retention pinpoints the period of time at which the "habitual residence" of the child is to be determined.

## II. SASHA'S HABITUAL RESIDENCE IN JUNE, 1996

### A. The Law Respecting Habitual Residence

■ In order to be entitled to the requested relief, Zuker must show that respondent Andrews is wrongfully retaining their son Sasha from the place of Sasha's "habitual residence." *Wanninger v. Wanninger*, 850 F.Supp. 78, 80 (D.Mass., 1994). Zuker argues that Argentina is Sasha's habitual residence.

■ The term "habitual residence" is not defined under the Convention. Instead, a child's "habitual residence" is to be determined by examining the specific facts and circumstances at hand. *Meredith v. Meredith*,

---

all purposes, including trial and entry of judgment, pursuant to 28 U.S.C. § 636(c).

**4.** There is no dispute in this case that at whatever time the retention, wrongful or otherwise,

took place, Zuker had rights of custody and was actually exercising those rights or would have been exercising them but for the retention. *See* Tr. 160.

759 F.Supp. 1432, 1434 (D.Ariz.1991). Courts should not interpret the term technically or restrictively. *Rydder v. Rydder,* 49 F.3d 369, 373 (8 Cir.1995).

One of the most frequently cited explanations of the term "habitual residence" is that set out by the High Court of Justice in *In re Bates,* No. CA 122–89, High Court of Justice, Family Div'l Ct. Royal Courts of Justice, United Kingdom (1989); *see, e.g., Feder v. Evans–Feder,* 63 F.3d 217, 222–24 (3rd Cir. 1995) (citing *Bates*); *Falls v. Downie,* 871 F.Supp. 100, 102 (D.Mass.1994) (same); *Slagenweit v. Slagenweit,* 841 F.Supp. 264, 268 (N.D.Ia.1993) (same); *In re Ponath,* 829 F.Supp. 363, 367 (D.Utah 1993) (same); *Levesque v. Levesque,* 816 F.Supp. 662, 666 (D.Kan., 1993) (same); *Harsacky v. Harsacky,* 930 S.W.2d 410, 413 (Ky.Ct.App.1996) (same). The *Bates* court explained by quoting a speech by Lord Scarman in 1983 as follows:

> [T]here must be a degree of settled purpose. The purpose may be one or there may be several. It may be specific or general. All that the law requires is that there is a settled purpose. That is not to say that the propositus intends to stay where he is indefinitely. Indeed his purpose while settled may be for a limited period. Education, business or profession, employment, health, family or merely love of the place spring to mind as common reasons for a choice of regular abode, and there may well be many others. All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled.

American courts have used this explication in their own determinations of where a child has his or her "habitual residence." In *Feder,* the Third Circuit cited *Bates* and explained:

> [A] child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a "degree of settled purpose" from the child's perspective. . . .
>
> [A] determination of whether any particular place satisfies this standard must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there.

*Feder,* 63 F.3d at 224.

Cases similar to the one at bar illustrate further the requirement that there be a "settled purpose." For instance, in *Slagenweit,* the parents had agreed that the child would travel from Germany, where she lived with her mother, to live with her father indefinitely in Iowa. The parties agreed the child would live with her father while her mother prepared to return to school, and that while in Iowa the child would be able to obtain needed medical attention superior to that which had been available to her in Germany. Eight months later, the child's mother demanded her return, and the father refused. *Slagenweit,* 841 F.Supp. at 266.

The court found that the child was not being wrongfully retained in Iowa. While the parties agreed the child's habitual residence initially had been in Germany, it had changed to Iowa as "a result of a change in geography and a passage in time." *Id.* at 269. Over that period of eight months which the court characterized as "a substantial passage of time," *Slagenweit,* 841 F.Supp. at 269, the court concluded the child had become a resident of Iowa through her involvement with her father and his girlfriend and through the medical community responsible for her treatment. The court deemed it significant that the parents initially had agreed that the child would live in Iowa for an indefinite period of time, and by the time the mother objected to the child's continued presence there, she was well-established in her new home in Iowa. *Id.*

In *Levesque,* a German citizen attempted to reconcile with her estranged husband by moving with their child to the United States, where he (the child's father) had been transferred from his army post in Germany. They lived in Kansas for nearly a year, after which time she returned to Germany with their child to visit her family. She returned to Kansas five weeks later, only to go back to Germany with the child almost immediately. He (the child's father) agreed that she could return with the child to Germany, but he

believed they would be gone only for a short time. Problems had developed in the marriage again, and shortly after the mother and child returned to Germany, it became apparent that she planned to remain in Germany with the child. Approximately three weeks later, the child's father flew to Germany, took the child without the mother's consent, and returned with the child to the United States. *Levesque,* 816 F.Supp. at 663.

The court ordered that the child be returned to Germany. Even though the child had lived with both parents in Kansas for nearly a year, the court concluded that the child's habitual residence switched to Germany after the couple agreed that the mother would return there with the child for an indefinite period of time. *Id.* at 666. This arrangement "amounted to a purpose with a sufficient degree of continuity to enable it properly to be described as settled." *Id.* (quoting *Bates* ).

In *Falls,* a German woman agreed that her child and the child's father would move from the family's residence in Germany to the United States for an indefinite period of time. The couple was experiencing financial difficulty, so they intended that he and the child would live with his parents in Massachusetts and look for work. The couple's relationship deteriorated during the separation, and eight months later, she sought her child's return to Germany. *Falls,* 871 F.Supp. at 100–01. The court held that during those eight months, the child had become sufficiently settled in Massachusetts so that it had become the child's habitual residence. *Id.* at 102.

An additional factor which seemed important to the *Falls* court was the child's young age; he was twenty-one months old when his mother sought his return to Germany, after a stay in this country of eight months. The court remarked, "He [the child] had become completely accustomed to life in this country with his father and grandparents; he barely knew his mother." *Falls,* 871 F.Supp. at 102.

Indeed, at least one other court has noted that a short period of time can be quite significant in the life of a young child. In *Feder,* the child's habitual residence was found to be Australia, even though he had lived there only six months. "Evan moved, with his mother and father, from Pennsylvania to Australia ... and stayed in Australia for close to six months, *a significant period of time for a four-year old child.*" *Feder,* 63 F.3d at 224 (emphasis added). This approach is consistent with the directive in *Feder* that the court must look to the child's circumstances, and to whether the child has become acclimated to the new locale, in determining the habitual residence, rather than to the parents' future intentions for the child. *Id.*

### B. Findings of Fact Respecting Sasha's Habitual Residence

Applying this law to the facts of this case, I find that for three periods (November, 1994 to May, 1995; May, 1995 to November, 1995; and November, 1995 to June, 1996), Sasha was a habitual resident of the country in which he was actually situated. This is certainly true from the point of view of Sasha. It is also true from the point of view of the shared intentions of the parents. Both parents intended that Andrews and Sasha would live in Argentina while Zuker finished the CD, both parents agreed to Andrews and Sasha returning to the United States for six months in 1995, and both parents agreed to Andrews' return with Sasha to Argentina in November, 1995. While I find that the expectation of both parents differed as to how long they and Sasha would stay in Argentina in on each occasion, each of the trips back and forth was essentially the product of an agreement between the parents, at least to the extent that the trips would take place. In fact, Andrews' return to the United States in June, 1996 with Sasha was agreed to between the parents,[5] but there was no agreement at that time on the length of stay in the United States.[6]

---

5. Zuker drove Andrews and Sasha to the airport and arranged for them to leave when Argentine authorities raised questions about the fact that they had overstayed the period in which they were allowed to be in the country. (Tr. 109, 131)

6. This fact distinguishes this case from the case of *Levesque v.. Levesque,* 816 F.Supp. 662, *discussed, supra,* at p. 137. In that case, the parents had agreed that the child would return to Germany with the mother for an indefinite peri-

While I credit Andrews' testimony that she never intended that she and Sasha would live in Argentina forever and that when she moved to Argentina in November, 1994, she intended to come back to the United States when Zuker's work in Argentina was finished, that does not establish that Sasha's habitual residence was not in Argentina during the months-long periods he and Andrews lived there. Thus, I find that in June, 1996, after seven months in Argentina, Argentina was Sasha's habitual residence even though Andrews wanted desperately to return to the United States with him months before the actual return.

## III. DATE OF RETENTION

### A. The Law Respecting When Retention Occurs

The court must first determine when the alleged wrongful retention began. As indicated, *supra*, Zuker contends that the wrongful retention commenced in July, 1997. In *Slagenweit*, the court held that the wrongful retention began when "the noncustodial parent ... clearly communicate[d][the] desire to regain custody and assert[ed][the] parental right to have [the child] live with [him or] her." *Slagenweit*, 841 F.Supp. at 270. In that case, the court determined that this occurred when the noncustodial parent first asked that the child be returned to her in Germany and the custodial parent refused.[7] And in *Falls*, the court likewise stated that the retention became wrongful, if at all, when the child's mother asked that the child be returned to her in Germany and the father refused. *Falls*, 871 F.Supp. at 102.

### B. Findings of Fact as to Date of Retention

I find that Zuker first asked that Andrews and Sasha return to live with him in Argentina in or about July, 1996, a month after Andrews and Sasha left Argentina. (Exh. 1) It is more difficult to determine when it was that Andrews refused to return to Argentina because she has admitted lying to Zuker, albeit allegedly under duress, as to her intentions.[8] She also admitted to giving mixed messages as to her intentions when she was in the United States in 1995. (Tr. 113)

There is also another dimension to the problem. On the record before me, although it is undoubtedly true that after her return to the United States in June, 1996, she told Zuker that she did not want to return to Argentina, it was not until July of 1997 that she told him that she and Sasha would not live with him in the United States and that she did not "want anything to do with him." (Tr. 75) Evidently, it had been a shared intention for a long period of time that when Zuker finished his work in Argentina, the couple would live together in the United States, perhaps in California. (Tr. 74, 110–111, 126, 131) While I credit Andrews' testimony that by February, 1997 when she learned that Zuker had been unfaithful to her, she resolved not to live with him again, there is nothing in the record to indicate that she informed Zuker of this until July, 1997. While this was due to the fact that she wanted to be able to retrieve the property she had left in Argentina and to collect the money which Zuker owed her, it nonetheless

---

od of time. I find that in the instant case, there was no agreement between the parents that Sasha would return to the United States with Andrews for an indefinite period of time in the sense that the period would be lengthy. It is true that there was no agreement on a "definite" period of time during which Andrews and Sasha would remain in the United States in the sense of agreement on a particular span of days or months. But Zuker expected that the time would be short and Andrews expected that Sasha would never return to Argentina to reside. Put another way, I do not find that Zuker agreed in June, 1996 that Andrews' and Sasha's visit to the United States would be more than a few weeks to a month.

7. In *Schroeder v. Vigil–Escalera Perez*, 76 Ohio Misc.2d 25, 664 N.E.2d 627 (1995), the court cited *Slagenweit* with approval in a case involving similar facts. The court in that case held that any wrongful retention did not begin until the parties actually "began a battle over custody of the child." *Id.* at 33–34, 664 N.E.2d at 632 (citing *Slagenweit*).

8. When she and Sasha left Argentina in June, 1996, she told him that she'd come back for a visit when they had enough money and also told him that they would be back in two weeks. (Tr. 134).

left Zuker in the dark as to her true intentions.

However, the petition alleges that Andrews wrongfully retained Sasha in the United States away from his habitual place of residence which Zuker alleges was Argentina. The retention occurred when Zuker knew that Andrews was not going to return Sasha to Argentina. Until he knew that Andrews would not return, it would be unfair to require Zuker to file a petition based on alleged wrongful retention.

Based on all the evidence, however, I find that Andrews, by moving out of her mother's apartment and renting her own place in Watertown, clearly communicated to Zuker that she was refusing to return to Argentina with Sasha. Until that time, Zuker more or less acquiesced in her remaining in Massachusetts. As he wrote on June 27, 1997 (Exh. 1 at p. 3):

> After a month or so [after Andrews and Sasha went to the United States in June, 1996] I requested their return to Argentina to which Patricia answered that the summer was nice in [sic] USA and in Argentina was winter. She continued extending their visit with excuses like "I have some patients I'm treating", etc. During that time she requested some items which I sent, and some money, which I wired, always thinking it would help their promp [sic] return to Argentina.

However, as soon Andrews got her own apartment, it was clear to Zuker that Andrews did not intend to comply with his request that she and Sasha return to Argentina. As he further stated on June 27, 1997 (Exh. 1 at p. 3):

> To compose, produce, record and publish a CD is a very complex attainment with many people involved so I was busy and time was flying for me to realize what was going on. Suddenly a few months ago she moved out her [sic] mother's place and rented her own. For a while I didn't know where they were since although she was calling, she wouldn't give me her new address.

Accordingly, I find that applying the law to the facts of this case, that Andrews' retention of Sasha occurred in or about February, 1997 when she moved into her own apartment in Watertown, Massachusetts because, based on all that occurred up until that point, it was by that act that Andrews communicated to Zuker that she was not going back to Argentina.

I further find that Zuker knew that Andrews had moved into her own apartment shortly after it happened. (Tr. 101) He asked his friend, Maxie, to help Andrews move. (Tr. 102) On May 7, 1997, he gave Andrews a document authorizing her to sell the New York City apartment and referred to Andrews' Watertown address in the body of the document. (Exh. 14) In sum, the retention of Sasha from what was his habitual residence in June, 1996 did not occur until February, 1997.

## IV. SASHA'S HABITUAL RESIDENCE IN FEBRUARY, 1997

The same reasoning which led to the conclusion that Sasha's habitual residence from November, 1995 to June, 1996 was in Argentina leads inexorably to the conclusion that his habitual residence in February, 1997 was in Massachusetts. While I find that during the period June, 1996 to February, 1997 the expectation of both parents as to how long Andrews and Sasha would remain in the United States differed, their remaining here was in substance the subject of a tacit agreement, or at least, an acquiescence on Zuker's part. (Tr. 87–88)

Accordingly, I rule that in February, 1997, Sasha's habitual residence was in Massachusetts.

## V. THE ALTERNATIVE ISSUE

As I indicated, I find that as of June, 1996, Argentina was Sasha's habitual residence. If I am incorrect and that the retention occurred in July, 1996 when Zuker asked Andrews to return Sasha to his habitual residence in Argentina, Zuker's petition was not filed until over a year later, i.e., in September, 1997. The issue becomes whether the requested return of Sasha to Argentina should be denied because at the time the petition was filed, i.e., September, 1997, Sa-

sha had become "settled" in his new environment in Massachusetts.

### A. The Law Respecting When a Child Has Become Settled

When the petition is filed more than a year after the retention, the respondent must show "evidence that the child[ ][is] in fact settled in or connected to the new environment so that, at least inferentially, return would be disruptive with likely harmful effects.... [T]here must be 'substantial evidence of the child's significant connections.'" *In re Robinson,* 983 F.Supp. 1339, 1345 (D.Colo.1997) (quoting Public Notice 957, 51 Fed.Reg. at 10,509).

In *Robinson,* the court found the children had become sufficiently settled in their new environment, since they enjoyed active involvement with the respondent's extended family, were enrolled in school and doing well, were active in extracurricular activities, and had established friendships. *Id.* at 1346. In *In re Wojcik,* 959 F.Supp. 413 (E.D.Mich. 1997), the court likewise found the children were settled in their new environment because they had been attending school or day care consistently; they had friends and relatives in the area; and they attended church regularly with their mother. *Id.* at 421. In contrast, the court noted that the uncontroverted evidence demonstrated the father's family in France was "indifferent to the children at best." *Id.*

The court in *In re Petition for Writ of Habeas Corpus for Coffield,* 96 Ohio App.3d 52, 644 N.E.2d 662 (1994), held that the child in question there had not become settled in his new environment at the time the petition for his return had been filed. But the child's father apparently had been trying to conceal their whereabouts, and so over a period of three years he had exposed the child only to a limited group of friends and relatives, "i.e., people whom [the father] could trust." The child was not enrolled in school or other activities and had not made friends in the community at large. Thus, the court held the boy was not settled in his new environment, so the Article 12 defense did not apply. *In re Petition for Writ of Habeas Corpus for Coffield,* 644 N.E.2d at 666.

Both the *Wojcik* and *Robinson* courts relied in part on the fact that the children at issue in those cases were "old enough to allow meaningful connections to the new environment to evolve." *Robinson,* 983 F.Supp. at 1345. Both courts contrasted *David S. v. Zamira S.,* 151 Misc.2d 630, 574 N.Y.S.2d 429 (1991), in which the court held that children who were 3 and 1½ years old were "not yet involved in school, extracurricular, community, religious or social activities which children of an older age would be," and so were not settled in their new environment. *Id.* at 636, 574 N.Y.S.2d at 433. In contrast, the children in *Wojcik* were 8 and 5 years old at the time of the hearing, *Wojcik,* 959 F.Supp. at 421; the children in *Robinson* were approximately 10 and 6 years of age. *Robinson,* 983 F.Supp. at 1341.

### B. Findings of Fact as to Whether Sasha was Settled as of September, 1997

As of September, 1997, Sasha was four years, two months old. Since June, 1996, he has attended the Waltham Day Care Center on a full-time basis even though Andrews moved from her mother's apartment in Waltham to Watertown. (Exh. 9) The Executive Director states that since 1996, "... Sasha has grown and thrived academically and socially" and "... attends birthday parties and playdates at his home and at the home of his friends." (Exh. 9) He has "established relationships with teachers, children and other staff." (*Id.*) He sees his grandmother two or three times a week and has "bonded" with her. (Tr. 31)

This evidence is both substantial and persuasive. No contrary evidence was introduced. Accordingly, I find that as of September, 1997, Sasha had become "settled in his new environment." [9]

---

**9.** The case of *David S.,* 151 Misc.2d 630, 574 N.Y.S.2d 429, is not to the contrary. The holding of that case was based on a lack of evidence submitted that the children had become settled in their new environment. There was no evidence that the children had "formed meaningful relationships" or that they attended "nursery school." *Id.,* 151 Misc.2d at 636, 574 N.Y.S.2d at 433.

142

## VI. CONCLUSION

In sum, I rule that as of June, 1996, Sasha's habitual residence was Argentina. I rule that it was in February, 1997 that Andrews communicated by both word and deed that she would not return to Argentina with Sasha as Zuker had requested in July, 1996. Thus, any wrongful retention occurred in February, 1997. However, I further find that in February, 1997, Sasha's habitual residence was in Massachusetts and it remained so. Thus, Andrews' retention of Sasha was not "wrongful" because she was not retaining him from what was then his habitual place of residence. Alternatively, if the date of Andrews' retention was July, 1996, I rule that when the Zuker's petition was filed over a year later on September 4, 1997, Sasha was settled in his new environment.

Accordingly, it is ORDERED that Zuker's Petition for return of Sasha to Argentina be, and the same hereby is, DISMISSED as without merit and judgment to that effect shall enter forthwith.