**Arnon MOZES, Petitioner,**

v.

**Michal MOZES, Respondent.**

**No. 98–3636–RAP (MANx).**

United States District Court, C.D. California.

Aug. 11, 1998.

---

William M. Hilton, Santa Clara, CA, for Petitioner.

Robert L. Shapiro, Christensen Miller Fink Jacobs Glaser Weil & Shapiro, Los Angeles, CA, Ira Lurvey, Judith Salkow Shapiro, Lurvey & Shapiro, Los Angeles, CA, for Respondent.

## ORDER DENYING PETITION FOR RETURN OF CHILDREN PURSUANT TO HAGUE CONVENTION

PAEZ, District Judge.

## I.

### Introduction

Pending before the Court is a petition filed by Arnon Mozes for the return of three of his children to Israel pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("the Convention"), Dec. 23, 1981, 51 Fed.Reg. 10494, 10498–502, as implemented by the United States in the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601–11610. Petitioner alleges that pursuant to the ICARA, his children have been wrongfully retained in the United States by respondent and must be returned to Israel. Respondent Michal Mozes, who is petitioner's wife and the mother of their children, contests the applicability of the Convention, denies that the children have been wrongfully retained and opposes the petition to remove the children to Israel.

Based on the reasons articulated below, this Court finds that the Mozes children—Chen, Guy and Keren—are habitual residents of the United States. Therefore, the protections of the Convention are not invoked, and they need not be returned to Israel pursuant to the International Child Abduction Remedies Act. The Petition for Return of Children is therefore **DENIED.**

## II.

### Procedural History

On April 17, 1998, respondent Michal Mozes filed an action for marital dissolution in Los Angeles County Superior Court, incident to which she was granted temporary custody of the four children, subject to petitioner Arnon Mozes's right to reasonable visitation. On April 19, 1998, petitioner was served with the petition for marital dissolution. On May 11, 1998, petitioner filed his Petition for Return of Children to Their Habitual Residence with this Court. The Court held an evidentiary hearing on August 4–5, 1998, to determine the children's habitual residence.

## III.

### Factual Background

Petitioner Arnon Mozes and respondent Michal Mozes are husband and wife. They

have four minor children: a daughter, Hadas,[1] age 14; a daughter, Chen, age 9; a son Guy and a daughter Keren, both age 5. Until April 1997, petitioner, respondent, and their children all lived in Israel and had done so for their entire lives. Mr. Mozes is the CEO of Yedioth Aharonoth, Ltd., and the Publisher of the Yedioth Aharonoth, the largest circulating newspaper in Israel. According to Mr. Mozes, Yedioth Aharonoth Ltd. and its related entities is the largest media group in Israel. Ms. Mozes is the primary caretaker of the children, and does not work outside the home.

It is undisputed that petitioner consented to respondent's request to spend fifteen months in Los Angeles, California with their four children, as it was her life long dream to do so. Such an experience would enable the children to attend American schools, improve their English, expose them to American culture and allow them to make new friends.

Respondent and the children left for Los Angeles in April 1997, and were to return to Israel in July 1998. Petitioner testified that he believed their stay was temporary, and that they would be in Los Angeles for a total of fifteen months.

Before Ms. Mozes and the children departed for the United States, Arnon and Michal Mozes sold two of their vehicles, and shipped many household items, clothing and the children's toys to Los Angeles. Once in Los Angeles, respondent rented a home in Beverly Hills for twelve months with an option for an additional three months ending on July 10, 1998. She purchased two automobiles, and leased another pursuant to a three year lease contract, for use in Los Angeles. In addition, she purchased necessary insurance and immediately enrolled the children in school and extra-curricular activities. Ms. Mozes, with her husband's encouragement and assistance, made contacts and obtained recommendations to work in California for the company helping to promote Israel's 50th Anniversary Celebration.

While his family was in Los Angeles, petitioner was in regular phone contact with them and visited in Los Angeles several times between April 1997 and April 1998. During such times, he assumed his role as husband and father and entertained and greeted friends and acquaintances as their host at the family's residence in Beverly Hills. He openly complimented Ms. Mozes and the children for how quickly and successfully they had adjusted to America. Between April 1997 and April 1998, petitioner knowingly provided all finances needed to support his wife and children in California.

According to respondent, the couple had marital problems prior to her departure from Israel, and the children's and her stay in California was contemplated from the outset to be of at least a year's duration, and perhaps longer. As evidence of this, she points out that in January 1997, she and Mr. Mozes leased the home they had built together in Israel to another couple for a one-year period, with an option to extend that lease for a second year. In addition, respondent testified that petitioner personally arranged for the children to follow her to Los Angeles on April 23, 1997, as she had left earlier for Beverly Hills to set up their new home. Petitioner paid all of the lease payments on respondent's new home in Beverly Hills, paid for the automobiles she purchased and stayed at their home on his visits to Los Angeles. At the hearing, Valerie Belsky, a family friend in Los Angeles, testified that in conversations with Mr. Mozes he seemingly assumed they would stay another year, and mentioned this several times.

Respondent testified that in December 1997, while visiting petitioner in Israel, she informed petitioner that she and the children were "very happy" in California and wanted to stay there permanently. According to respondent, Mr. Mozes responded that she could stay there forever. Petitioner allegedly told respondent to go ahead and make plans to stay with the children in Beverly Hills for another year, until July 1999.

Respondent further testified that on a visit to Israel in January 1998 she made without the children, the couple again spoke of respondent's plans to remain in California with

---

1. Hadas Mozes has returned to Israel by mutual agreement of the parents. Accordingly, her residency in Israel is not affected by the Court's resolution of the issues raised in the petition.

the children. At that time, petitioner "confessed" that he had a girlfriend, and that he did not object to respondent and the children staying in California. He also allegedly stated that if his wife did remain in California, he would move in with his girlfriend.

Based on this conversation, respondent testified that she leased another home in Beverly Hills for the period from February 1, 1998 through July 31, 1999. Petitioner did not object to the new lease, has since made all of the lease payments on the newly leased home, and stayed there on his April 1998 visit. Petitioner testified that he was told by his wife that the lease could be terminated prior to July 31, 1999 with three months notice and that this is the only reason he did not protest the lease of the second home.

According to respondent, on April 9, 1998, petitioner told her he wanted a divorce, and asked her to sign a financial agreement in which she would give up significant property rights. He reportedly said that if she did not agree to this financial agreement, he would fight to get her and the children back to Israel. He allegedly repeated this on several occasions.

On April 17, 1998, respondent filed an action for marital dissolution in the Los Angeles County Superior Court, incident to which she was granted temporary custody of the four children, subject to Mr. Mozes's right to reasonable visitation. Respondent also obtained a temporary restraining order enjoining Mr. Mozes from removing the children from southern California. On April 19, 1998, shortly before his return flight to Israel, petitioner was served with the petition for marital dissolution and temporary restraining order. Petitioner contends that in commencing the action for custody and dissolution of marriage on April 17, 1998, respondent, without the knowledge or consent of petitioner, wrongfully retained the minor children in Los Angeles. Respondent contends that while she had intended eventually to return to Israel, the children are now habitual residents of the United States because they are settled into their lives in California, are accustomed to and thriving in their new schools and extra-curricular activities, and have many friends in Los Angeles.

## IV.

### *Discussion*

#### A. History, Purpose, and Jurisdiction of the Hague Convention

The Hague Convention was adopted by the signatory nations "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." The Hague Convention, Preamble. Both Israel and the United States are signatory nations. The United States ratified the Convention in 1988. In the United States, the enabling legislation is codified as the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 *et seq.* Pursuant to the ICARA, state and federal district courts have concurrent original jurisdiction over actions arising under the Convention. 42 U.S.C. § 11603(a). Any person seeking the return of a child under the Convention may commence a civil action by filing a petition in a court where the child is located. *Id.* at § 11603(b).

The purpose of the Convention is to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court. *See Friedrich v. Friedrich,* 983 F.2d 1396, 1400 (6th Cir.1993). The "cornerstone" of the Convention is the mandated return of the child to his or her circumstances prior to the abduction if one parent's removal of the child or retention in a signatory state has violated the custody rights of the other, and is, therefore, "wrongful." *See Feder v. Evans–Feder,* 63 F.3d 217, 221 (3rd Cir.1995) (discussing Hague Convention, Article 12).

The Convention is designed to restore the "factual" status quo which is unilaterally altered when a parent abducts a child and aims to protect the legal custody rights of the non-abducting parent. *See Feder,* 63 F.3d at 221 (citing Pub. Notice 957, 51 Fed.Reg. 10494, 10505 (1986)). Under the Convention, a court may determine the merits of a wrongful abduction case. The Convention, however, does not settle custody disputes, explicitly

stating that "[a] decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue." Hague Convention, Article 19.

## B. Wrongful Removal or Retention

■ Under the Convention and the ICARA, petitioner has the burden of showing by a preponderance of the evidence that the removal or retention was wrongful. 42 U.S.C. § 11603(e)(1). Under Article 3 of the Convention, the removal or retention of a child is "wrongful" where:

1. It is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was *habitually resident* immediately before the removal or retention; and

2. At the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention. (emphasis added).

For purposes of the Convention, "rights of custody shall include rights relating to the care of the person of the child, and, in particular, the right to determine the child's place of residence[.]" Hague Convention, Article 5a.

■ Thus, to demonstrate the removal or retention was wrongful, as a threshold matter, Mr. Mozes must show that: (1) Ms. Mozes removed the children from their habitual residence; and (2) Mr. Mozes was exercising his right of custody at the time of removal or retention. *See Krishna v. Krishna,* 1997 WL 195439 *2 (N.D.Cal.1997).

## C. Habitual Residence

### 1. Standard

■ To invoke the protection of the Convention, the taking or retention of a minor child must have occurred from a place where the child habitually resides. *See Meredith v. Meredith,* 759 F.Supp. 1432, 1436 (D.Ariz.1991). Otherwise, by definition, no wrongful removal or retention will have occurred. In other words, if the United States

is the children's habitual residence, then they have not been wrongfully retained here and the protections of the Convention cannot be invoked. On the other hand, if Israel is the habitual residence of the children, then they may have been wrongfully removed, and the Court must continue its inquiry. Thus, the children's habitual residence is the threshold issue the Court must determine.

The Convention does not provide a definition for "habitual residence." A few circuit courts, however, and the High Court of Justice of the United Kingdom, and other state and federal courts have considered the meaning of "habitual residence" in Hague Convention cases. A frequently cited British case concluded that there is no real distinction between habitual and ordinary residence. *See Re Bates,* No. CA 122.89, 1, 10, High Court of Justice, United Kingdom, (1989). The Court in *Bates* added a word of caution:

> It is greatly to be hoped that the courts will resist the temptation to develop detailed and restrictive rules as to habitual residence, which might make it as technical a term as common law domicile. The facts and circumstances of each case should continue to be assessed without resort to presumptions or presuppositions.

*See Bates* at 9–10.

*Bates* involved a two and one-half year old child who had been removed from her mother's apartment in New York and taken by the nanny to the father's home in England, with the father's knowledge and approval. Although the child and her parents had lived most of their lives in England, and had only recently rented an apartment in New York where they were to stay three months, the *Bates* court held that the child's habitual residence was in the United States because her care, accommodation and therapy treatment in New York during the period of three months [or so] that would elapse before the father's return to London "amounted to a purpose with a sufficient degree of continuity to enable it properly to be described as settled." (*See Bates,* No. CA 122.89 at 10).

■ A child can have only one habitual residence. *See Friedrich,* 983 F.2d at 1402. To determine habitual residence, the Court

must focus on the child, not the parents, and examine past experience, not future intentions. *Id.* A frequently cited Sixth Circuit case held that habitual residence can be "altered" only by a change in geography and the passage of time, not by changes in parental affection and responsibility. *See Friedrich,* 983 F.2d at 1402. "The change in geography must occur before the questionable removal." Otherwise, "it would be an open invitation to all parents who abduct their children to characterize their wrongful removals as alterations of habitual residence," rendering the Convention "meaningless." *See id.* at 1402.

The Third Circuit in *Feder,* "guided by the aims and spirit of the Convention and assisted by the tenets enunciated in *Friedrich v. Friedrich and Bates,*" held that a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a "degree of settled" purpose from the child's perspective. *Feder,* 63 F.3d at 224. The court added that any determination of whether any particular place satisfies this standard "must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there." *Id.* at 224. In *Feder,* the court disagreed with the district court's conclusion that the United States, not Australia, was the child's habitual residence and stated that the district court placed "undue emphasis" on the fact that the majority of the child's years had been spent in the United States, ignoring the approximately six months that the child lived in Australia (where the child appeared to be settled indefinitely) immediately preceding his return to the United States. *Id.* The court added that the district court had disregarded the parents' shared intentions with regard to their son's stay in Australia.

In line with the reasoning of *Feder,* a number of federal district courts throughout the country have held that a child's "state of habitual residence" is the country in which the child has been living with the prospect of an indefinite continuance of residence in that country, by mutual agreement or acquies-

cence by both parents. *See Falls v. Downie,* 871 F.Supp. 100, 102 (D.Mass.1994) (holding that although the two-year-old child had been living in the United States for only eight months, the child's habitual residence was the United States because he had become completely accustomed to life in the U.S. with his father, barely knew his mother, and had completely "settled" with the consent of his mother indefinitely in the U.S.); *Levesque,* 816 F.Supp. at 666 (holding that the child's habitual residence was Germany because "arrangements as to residence had been agreed to and amounted to a purpose with a sufficient degree of continuity to enable it properly to be described as settled" and because there was an intent to remain in Germany for an indefinite period of time by mutual agreement).

The courts in *Feder, Falls* and *Levesque* found it convincing that the children were to remain indefinitely in their new forum. However, according to the *Bates* court, it is not necessary "that the propositus intends to stay where he is indefinitely. Indeed his purpose while settled may be for a limited period." *Bates,* at 10; *see also In re Application of Ponath,* 829 F.Supp. 363, 367 (C.D.Utah 1993). The *Bates* court listed education, business or profession, employment, health, family or merely love of the place as common reasons for a choice of regular abode. *See* Bates at 10; *see also Ponath,* 829 F.Supp. at 367. All that is necessary, the *Bates* court emphasized, "is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled." *Bates* at 10.

The mere fact that a move is to be temporary or for a fixed period of time is not always sufficient to prevent a shift in habitual residence from one forum to another. Indeed, the duration of the residence in the new location when combined with other factors may be sufficient to outweigh such factors as the temporary purpose of the residence. *See* Dr. E.M. Clive, *The Concept of Habitual Residence,* JURID. REV., Part 3, 137, 140 (1997) (hereinafter "Clive"). In his article, Clive states that he has not located any case where a child has been found not to be habitually resident in a country where he or

she has lived for a year or more. Clive at 141. In *Zenel v. Haddow,* the Lord Ordinary found that after fifteen months a child was habitually resident in Australia although there was no settled intention on the part of the parents to remain in Australia. "It seems to me that, while intention is undoubtedly a very important consideration, there must come a state when the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place." *See id.* at 141 (citing *Zenel v. Haddow,* 1993 S.L.T. 975; 1993 S.C.L.R. 872).

In a Šwedish case, *Johnson v. Johnson,* an American court had confirmed an agreement between the parents of a child that they were to have custody on an alternating basis—just over two years with the mother in Sweden followed by two years with the father in the United States, with the father to have substantially shorter periods of custody in later years. At the end of the first period in Sweden the mother retained the child in spite of an attempt by the father to use the Convention to obtain her return. The Supreme Administrative Court of Sweden held that by that time the child had become habitually resident in Sweden. The Court noted that the child had been staying with the mother in Sweden for more than two years when the question of return became relevant and had adjusted to circumstances in the place where she was living. The fact that the stay in Sweden was initially intended to be limited in time did not prevail over the "brute facts of location, duration and settlement." *See* Clive at 140 (citing *Johnson v. Johnson,* Judgment of the Supreme Administrative Court of Sweden, May 9, 1996 (Case No. 7505–1995)).

In *Re A.* a family had been in Iceland for two years where the father had been stationed as a United States serviceman on a military base. The court held that the children were habitually resident in Iceland. In that case, their settled residence there *prevailed* over the fact that the father's posting was temporary and was expected to last only for some three years. *See* Clive at 141 (citing *Re A. (Minors) (Abduction: Habitual Residence)* [1996] 1 All E.R. 24). One English court held that a child who was sent

from Canada to stay with her father in Minnesota for a school year was habitually resident in Minnesota when removed by her mother after only four months. *See* Clive at 141, (citing *Re S. (A Minor) (Abduction)* [1991] 2 F.L.R. 224).

Thus, the temporary nature of a move must not necessarily trump other factors such as settlement and acculturation in the determination of habitual residence. This would lead to absurd results. Clive at 145. Suppose, for example, that a child has lived for many years in a new country, it would be "an abuse of ordinary language" to say that the child had been habitually resident for all that time in the country from which he or she had been removed, and had not become habitually resident in the new country. *See* Clive at 145.

 In sum, to establish that the habitual residence of a child has shifted, the law requires that a child be in the new forum by mutual consent of the parents and that the child has become settled in that new forum. The fact that a child is to remain indefinitely in a new forum may strengthen the argument that the new forum is the child's habitual residence, as it did in *Feder, Falls,* and *Levesque;* yet it is not a necessary condition to establishing the habitual residence of a child.

### 2. Application

According to petitioner, the wrongful retention of the children began on April 17, 1998, when Ms. Mozes filed for dissolution of her marriage in the Los Angeles Superior Court and obtained a temporary restraining order. By that time, however, the children had been living in Los Angeles for approximately one year. The parties stipulate that they agreed that the children would remain in the United States until July 1998. However, there is a dispute as to whether the parties agreed that the date of return had been extended to July 1999, if it had become indefinite or remained unchanged. At the very least, the parties discussed the possibility of the children remaining in the United States for another year, and may have even come to such an understanding. In April 1998, it is clear that petitioner decided he

wanted the children to return to Israel as originally planned by July 1998.[2]

The undisputed evidence establishes that by April 17, 1998, the children had settled into their new home, were enrolled and participating full time in schools and social, cultural and religious activities. They had successfully completed a year of school in the United States, quickly learned English, made new friends, and were accustomed to and thriving in their new life in Beverly Hills. It is clear that from the children's perspective this very full year amounts to a "purpose with sufficient degree of continuity to enable it to be properly described as settled." *Bates*, No. CA 122.89 at 10.[3] Stated in the language of the Hague Convention, the Court finds that by April 17, 1998, the habitual residence of the Mozes children—Chen, Guy and Keren—was the United States (Beverly Hills, California).

## V.

### *Conclusion*

After careful review of all the evidence and arguments, and without making any determination as to the custody of the children, the Court finds that **Chen, Guy and Keren Mozes are habitual residents of the United States.** Therefore, the protections of the Convention cannot be invoked by petitioner, and they need not be returned to Israel pursuant to the International Child Abduction Remedies Act. The Petition for Return of Children is **DENIED.**

The foregoing shall constitute the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52. Judgment shall be entered forthwith.

**IT IS SO ORDERED.**

2. Normally, the Court must determine the date of the actual "retention." The date of retention is important as it "pinpoints the period of time at which the habitual residence of the child is to be determined." *Zuker v. Andrews*, 1998 WL 169506 *1 (D.Mass.1998). Petitioner asserts that by filing a petition for dissolution of marriage, respondent Michal Mozes terminated any agreement (alleged or otherwise) between the parties and has, as a matter of law, "wrongfully retained" the children in California. Respondent asserts that she was merely seeking the protection of the Los Angeles Superior Court to keep petitioner from summarily abducting the children, and that this cannot be considered a "wrongful retention" by her.

Regardless of whether respondent's Superior Court action constituted a retention, the Hague Convention requires that for a retention to be "wrongful," it must keep the children away from their *habitual residence* at the time of the retention. Thus, because the Court finds that the United States was the children's habitual residence as of the date of the filing of the marital dissolution petition, April 17, 1998(the earliest possible retention date), it need not determine whether the retention occurred at that time or at some later date (July 1998).

3. Petitioner asserts that this case is similar to that of *In re S.* in which a family was to live in Britain for a year while the father was on sabbatical and then return to Israel. In that case, the court held that Israel had remained the habitual residence of the children. At the time of the court's decision, however, the children had lived in England for only six months. *See In Re S. (Minors) (Abduction: Wrongful Retention)* [1994] F.L.R. 70 (Exh. 08).