**In the Matter of Paulina KOC, infant under the age of 16.**

**Andrzej Koc, Petitioner,**

v.

**Krystyna Koc, Respondent.**

**No. 00 CV 5160(EHN).**

United States District Court, E.D. New York.

Jan. 18, 2001.

Saul P. Morgenstern, Dewey Ballantine, Edith Joseph Owen, Dewey Ballantine, LLP, New York City, for plaintiff.

Mark Broydes, Law Office of Mark Broydes, Bronx, NY, for defendant.

## REPORT AND RECOMMENDATION

POLLAK, United States Magistrate Judge.

On August 25, 2000, petitioner Andrzej Koc filed a petition pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980, reprinted in 51 Fed.Reg. 10,494 (March 26, 1986) (the "Convention"), and implemented by the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601–11610 (2000), seeking the return of his daughter, Paulina Koc, to Poland (the "Petition"). By order dated November 17, 2000, the petition was referred to the undersigned to conduct a hearing and prepare a Report and Recommendation.

## FACTUAL BACKGROUND

Petitioner, a citizen of Poland, married the respondent Krystyna Koc, also a Pol-

ish citizen, in Athens, Greece on December 29, 1990. (Koc Decl. ¶¶ 1–3).[1] On February 2, 1992, their daughter, Paulina, was born in Athens. (*Id.* ¶ 4). She is also a Polish citizen and lived with both her parents in Poland until May 1998. (*Id.* ¶¶ 4–5; 12/1/00 Tr. at 26).

In 1997, during the winter recess, Ms. Koc traveled to the United States with Paulina for two weeks to visit her family. (12/1/00 Tr. at 26). She returned with the child to Poland at the conclusion of the two-week visit. (*Id.*) Ms. Koc also came to the United States in 1997 without her daughter, remaining here for four or five months. (*Id.* at 6, 27). During that time, Mr. Koc cared for the child in Poland. (*Id.* at 27).

In May 1998, Ms. Koc traveled again to the United States with Paulina to visit Ms. Koc's parents. (*Id.* at 7, 26). According to Ms. Koc, she received a six month visa which expired in November 1998. (*Id.* at 7, 16). Neither she nor Paulina currently have permanent resident alien status, and at this time they are technically in the United States illegally. (*Id.* at 16–17).

Mr. Koc testified that his wife and daughter were scheduled to return to Poland at the end of the summer vacation in August 1998 so that Paulina could attend school in the fall.[2] (*Id.* at 7, 26–27). However, when the time came for Ms. Koc to return to Poland, she made the decision to remain in the United States. (*Id.* at 7). Ms. Koc testified that when she left Poland in May 1998, she was planning to return to Poland and she told her husband she would be returning. (*Id.* at 17). She tes-

---

1. The facts recited herein are derived from the Declaration of Andrzej Koc, dated August 24, 2000, submitted in support of his Petition ("Koc Decl."), and from the testimony of the various witnesses during the Hague Convention hearing held before this Court on Decem-

ber 1, 2000 ("12/1/00 Tr.") and on December 19, 2000 ("12/19/00 Tr.").

2. According to Mr. Koc, Paulina had already been enrolled in kindergarten in Poland to start that fall semester. (*Id.* at 27).

tified that she decided to stay in the United States, however, because "I don't have anyone there. Here I can—I have a family and I can depend on their help." (*Id.*)

Ms. Koc informed her husband by phone of her decision to stay in the United States, and he demanded that she return to Poland with the child. (*Id.* at 7). According to Ms. Koc, her husband wrote letters to Ms. Koc's sister and her parents and he sent short letters to the child as well. (*Id.* at 8). In addition, Mr. Koc tried to convince his wife to return to Poland whenever she contacted him by phone. (*Id.* at 27). Indeed, Mr. Koc testified that he "hope[d]" that she would return to Poland (*id.* at 27), and she "repeatedly" told him that she would. (Koc Decl. ¶ 6).

According to Ms. Koc, she and Paulina resided with her parents when they originally came to the United States in May 1998, staying at her parents' home at 107 Engert Avenue in Brooklyn from May 1998 until August 1998, at which time she moved to 227 East 7th Street in Brooklyn. (12/1/00 Tr. at 14–15, 18). She subsequently moved with Paulina to another apartment, located at 87–86 116th Street in Richmond Hill, Queens, where she claims to have lived for a year and a half. (*Id.* at 18, 14).[3]

There appears to be some dispute as to whether Ms. Koc kept her husband informed as to her whereabouts. Ms. Koc claims that while Mr. Koc had her phone number, he never asked her or her parents for Ms. Koc's address. (*Id.* at 18). By contrast, Mr. Koc states that he had only periodic phone contact with his daughter after August 1998. (*Id.* at 28). He testified that at first he would speak to Paulina

once a month and that later in the spring of 1999, he received phone calls from his daughter more frequently. (*Id.* at 27). At that time, his "hope was revived that after all we were going to work it out and we were going to meet." (*Id.* at 27–28). However, he testified that for nine months, his contact with his daughter was severed completely until late July 2000 when his wife contacted him again. (*Id.* at 28).

When asked on cross-examination whether he knew why Ms. Koc did not want him to know her address, Mr. Koc testified that "[f]rom what I know, she is living with another man, and that most probably, this is the reason." (*Id.* at 41). He admitted that he told his wife in a phone conversation that he would do everything to bring back his daughter. (*Id.*) He sent an email to Ms. Koc's sister in which he cited a Polish criminal law that makes it a crime to kidnap a child. (*Id.* at 43–44). He also testified that it is possible in Poland to notify the Polish border patrol, and they will stop the child if she and her mother return to Poland. (*Id.* at 43). However, it did not appear from the testimony that Mr. Koc had made such a notification. He also conceded that on the day prior to the hearing, his wife voluntarily, without court order, allowed him to see the child. (*Id.* at 35).

Although Mr. Koc believed that his wife and daughter would have to return to Poland in November 1998 when their visas expired, he attempted on four occasions to get a visa to come to the United States to visit his daughter. (*Id.* at 28–29; Koc Decl. ¶ 9). On each occasion, his application was denied. (12/1/00 Tr. at 28–29; Koc Decl. ¶ 9). He testified that he was told that as long as his wife and daughter

---

**3.** Ms. Koc's testimony regarding her various residences here in the United States and the length of time she has lived in the current location is contradicted by the testimony of other witnesses (*see* discussion *infra* at 143), and by Paulina's school attendance in Brooklyn at a time when Ms. Koc testified that they lived in Queens. (*See infra* at p. 142, n. 6).

were here illegally, he would not be granted a visa. (12/1/00 Tr. at 29, 36; Koc Decl. ¶ 9).[4]

On December 29, 1999, Mr. Koc contacted the Polish Central Authority and filed an application for assistance. (Koc Decl. ¶ 10; 12/1/00 Tr. at 32). He testified that according to the Polish Central Authority, there "may be big problems" with getting Paulina returned to Poland because she had been in the United States for more than one year and that he should instead seek contact with the child. (12/1/00 Tr. at 32).[5]

According to Mr. Koc, his daughter has family, including grandparents and cousins, still living in Poland and that she "had quite a few friends" in Poland. (Id. at 29 30). He testified that whenever he visits her friends, they ask when Paulina is returning to Poland; "Paulina was a very open child who made friends easily and she really had lots of friends." (Id.) He testified that when he spoke with Paulina, she would ask about her friends. (Id.) Before she left Poland, Paulina attended religious instruction in a little school next to the church. (Id. at 44). According to Mr. Koc, he enrolled Paulina in the school when his wife came to the United States without the child in 1997 and that she

continued to attend that school until her mother brought her to the United States in May 1998. (Id.)

Mr. Koc, who is a music teacher in Poland, still maintains the same apartment that he had when his wife and daughter were living with him and he testified that Paulina's room is "[i]n the same condition as if she had left yesterday." (Id. at 26, 30). Mr. Koc testified that when Paulina lived with him in Poland, he took care of her, "[b]athing, playing ... [w]ashing her laundry," and cooking for her when his wife went to the United States. (Id. at 31–32).

Ms. Koc testified that she has completed her higher education and that she has a degree in music. (Id. at 15). She testified that she taught music in the same elementary school as her husband for several years in Poland. (Id.) According to Ms. Koc, after she came to the United States in 1998, Paulina attended first grade at a Catholic school while they resided at 227 East 7th Street in Brooklyn. (Id. at 9, 19). Since that time, Paulina has attended two different public schools. (Id.) She attended second grade in a public school in Greenpoint, Brooklyn (id. at 19–20), and she is currently in third grade at a different public school in Queens. (Id. at 9, 20).[6]

4. In November 2000, Mr. Koc was granted a visa pursuant to an order of this Court requiring his attendance at the Hague Convention hearing. (12/1/00 Tr. at 29)

5. It should be noted that there is no order to that effect from the Polish Central Authority. (12/1/00 Tr. at 33).

6. There seems to be some discrepancy in the dates testified to by Ms. Koc regarding the schools Paulina attended and the locations at which Ms. Koc and Paulina lived during the school year. Ms. Koc testified that she and Paulina have lived at their present address, in Queens, for a year and a half, which would be since June 1999. (12/1/00 Tr. at 18, 14). However, Ms. Koc also testified that Paulina

attended public school in Brooklyn during the 1999–2000 school year (id. at 19–20), which encompassed the months from September 1999 to June 2000. Thus, if Ms. Koc's testimony is to be believed, Paulina would have had to travel between school in Brooklyn and her home in Queens for the entire school year in 1999 while she was living at the Queens address. It is unclear to this Court why, if she was living in Queens in September 1999, the child did not attend public school in Queens rather than moving to a new public school in Brooklyn. The Court concludes that either Ms. Koc was mistaken or there was a problem resulting from the need for translation and that she and Paulina have lived at the Queens address for less than a

According to Ms. Koc, Paulina attended an after-school program while she was in second grade, but currently she does not participate in any after-school programs at this new school. (*Id.* at 20). When asked if Paulina ever has friends from school come over to play, Ms. Koc testified that in the school she is currently attending, "she does not have Polish children in that class, but quite often she meets children her own age, children I work with." (*Id.*) According to Ms. Koc, Paulina speaks English with her friends. (*Id.*)

Ms. Koc testified that Paulina has medical insurance in this country, and she produced a medical card from New York Hospital Community Care which Ms. Koc testified allows her to get free doctors' visits for Paulina. She also uses the card for the dentist and to purchase medication for Paulina. (*Id.* at 23). Ms. Koc admitted, however, that although she is currently working, she does not pay taxes. (*Id.* at 19).

When asked what she would do if her child was ordered returned back to Poland, Ms. Koc stated that she would return to Poland, but would not live with Mr. Koc. (*Id.* at 15, 24). She also testified that in the spring of 2000, she went to her lawyer's office to initiate divorce proceedings. (*Id.* at 25).[7]

Irena Krotoszynska, respondent's mother, testified that Ms. Koc lived with her and with her husband when Ms. Koc and Paulina first came to the United States, but that after Ms. Koc left their home, she had three addresses—one in Boro Park, the one in Jamaica where she currently resides, and then a temporary address where she lived with a female friend for a month.[8] (12/19/00 Tr. at 5). Ms. Krotoszynska testified that her daughter works as a musician, playing organs and teaching music. (*Id.* at 6). According to Ms. Krotoszynska, she and her husband provide financial assistance to Ms. Koc now and previously sent money and packages to her and to petitioner when she was living in Poland. (*Id.* at 6–7).

Ms. Krotoszynska testified that Paulina stays with her or with her other daughter while Ms. Koc works. (12/19/00 Tr. at 7). She also stated that Ms. Koc pays a student to care for Paulina. (*Id.*) When asked how often she sees Paulina, Ms. Krotoszynska stated, "I don't see her that often because she is in school from nine to four and on Saturday she goes to Polish school, but Saturday and Sunday, yes." (*Id.* at 8). It appears that Ms. Krotoszynska and her husband have also overstayed their visas and are waiting for papers to remain in the United States, but that one of Ms. Koc's sister-in-laws has permanent residence status here and Ms. Koc's sister and brother-in-law have been told that they will get their green cards. (*Id.* at 10). Ms. Krotoszynska testified that she currently has another daughter who lives in Poland and works at the same school as Mr. Koc. (*Id.* at 11). According to Ms. Krotoszynska, her daughter in Poland earns "very little," maybe $200 per month. (*Id.*)

Krystyne Kopec testified for respondent, stating that Ms. Koc has been teaching

---

year and a half, consistent with the testimony of another of Ms. Koc's witnesses and the child's school attendance in Brooklyn during 1999–2000.

7. The evening after she testified at the hearing before this Court on December 1, 2000, Ms. Koc gave birth to a second daughter.

8. When asked if she lived with a woman named Sofia Segara, Ms. Koc denied that she ever resided "in the same apartment with such woman." (12/1/00 Tr. at 18).

piano lessons to her two children for the past two years. (12/19/00 Tr. at 14). According to Ms. Kopec, Ms. Koc is a "very responsible person," a good teacher, and she has referred Ms. Koc to others seeking a piano teacher. (*Id.* at 14–15). Ms. Kopec testified that she currently runs a Polish language and culture school and has proposed hiring Ms. Koc as a teacher of music in the school. (*Id.* at 15). She testified that she would be willing to sponsor Ms. Koc for work purposes here in the United States. (*Id.*) However, due to her recent pregnancy, Ms. Koc told Ms. Kopec that she wanted to wait to decide whether to accept the new teaching position offered by Ms. Kopec until after the baby was born. (*Id.* at 16). Ms. Kopec made it clear that she had not begun the process to sponsor Ms. Koc. (*Id.* at 19).

Ms. Kopec testified that Paulina plays with her boys and with the daughters of her neighbor. (*Id.* at 17).[9] She also testified that she attended a birthday party for Paulina where there were 15 to 20 children in attendance. (*Id.* at 16–18).

This Court interviewed the child briefly *in camera*.[10] Paulina speaks excellent English and although initially a little shy, answered the Court's questions clearly and without hesitation. She stated that she is currently in third grade and that her favorite subjects are math and science.

(12/19/00 In Camera Tr. at 2).[11] When asked what she does after school, Paulina stated that in second grade she went to "after school" where she did reading and writing. (*Id.* at 2–3). When asked if she was going to participate in after school activities this year, Paulina stated:

> I don't know because this school—we moved again and we're in this school I'm going to the Queens school now ... I don't know what's going to be after school because I'm the new kid in class.

(*Id.* at 3). When asked if it was hard to make new friends, Paulina admitted, "It's hard. I just can't be shy and I gotta just ask (ui)." (*Id.*) When asked if she had friends come over to her house, Paulina told this Court "not really," nor does she ever go to their houses. (*Id.* at 4). She does have a best friend but she only plays with her in school. (*Id.*) There is one little boy in her class who lives on her street but Paulina said that she doesn't play with him after school. (*Id.*) She seemed excited about her new sister. (*Id.* at 5–6).

When asked about her relatives in Poland, Paulina told the Court about her cousins who live in Poland but who had arrived in the United States the day before the hearing. (*Id.* at 6) When asked if it was good to see them, Paulina responded, "Yeah. I was so excited. The little girl is

---

**9.** It is not clear to this Court, however, whether Ms. Kopec was referring to Paulina's neighbors in the prior residence or in her current residence. Again, there is some discrepancy between Ms. Kopec's testimony and Ms. Koc's testimony. Although Ms. Kopec testified that she moved out of the Brooklyn neighborhood in January 2000 (12/19/00 Tr. at 19), Ms. Koc testified that she has been living at her current Queens address for a year and a half (12/1/00 Tr. at 14, 18), which, if true, would mean that she moved out of the neighborhood in June 1999, well before Ms. Kopec.

**10.** Paulina was interviewed by this Court outside of the presence of her parents, although they both accompanied Paulina to chambers and waited outside the door. In order to make Paulina more comfortable, I did not wear my judicial robe and discussed the Harry Potter books with her. *See* 12/19/00 Tr. at 8–9; *see also Blondin v. Dubois*, 238 F.3d 153, 167 (2d Cir.2000) (noting that the district judge interviewed the children in chambers *without the parents*, gave them toys to play with, and did not wear his judicial robe).

**11.** Citations to ("12/19/00 In Camera Tr. at") refer to this Court's *in camera* interview of Paulina Koc.

really tall now. The last time I saw her, she was a little baby." (*Id.*) She told the Court that she had a grandmother and grandfather, cousins, aunts and uncles in Poland and "[a] lot of friends." (*Id.* at 7). When asked whether she missed her friends, Paulina said "[a] little." (*Id.* at 7). She told the Court that in Poland she went to a religious school and that since October 2000 she has been attending a school where religion is taught. (*Id.* at 7–8).

She stated that when her mother goes to work, she goes sometimes to her mother's friend's house where there are two older boys. (*Id.* at 9–10). She also told the Court that she wanted to stay here "[b]ecause I have more friends here." (*Id.* at 10).[12]

## DISCUSSION

### 1. Standards

The Convention, to which both the United States and Poland are signatories, was enacted in order to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Hague Convention, Preamble, 51 Fed.Reg. at 10,498; *see Croll v. Croll,* 229 F.3d 133, 137 (2d Cir.2000);[13] *Blondin v. Dubois,* 189 F.3d 240, 244–45 (2d Cir.1999).[14] Under the

Convention, the court " 'has the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim.' " *Blondin v. Dubois,* 189 F.3d at 245 (citing *Friedrich v. Friedrich,* 983 F.2d 1396, 1400 (6th Cir. 1993)); *accord Wojcik v. Wojcik,* 959 F.Supp. 413, 416 (E.D.Mich.1997). The Convention is intended to " 'restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.' " *Lops v. Lops,* 140 F.3d 927, 936 (11th Cir.1998) (quoting *Friedrich v. Friedrich,* 78 F.3d 1060, 1064 (6th Cir.1996)), *cert. denied,* 525 U.S. 1158, 119 S.Ct. 1068, 143 L.Ed.2d 71 (1999). This is because the Convention is premised on the principle that the country where the child is a "habitual resident" is in the best position " 'to decide upon questions of custody and access.' " *Croll v. Croll,* 229 F.3d at 137 (quoting Elisa Perez–Vera, Explanatory Report: Hague Conference on Private International Law, in 3 Acts and Documents of the Fourteenth Session (Child Abduction) 426, 434–35, ¶ 34 (1980)).[15]

In 1988, the United States Congress adopted the International Child Abduction Remedies Act, 42 U.S.C. § 11601 ("ICARA"), in order to implement the Convention. *See Croll v. Croll,* 229 F.3d at 134; *Wojcik v. Wojcik,* 959 F.Supp. at 417;

---

**12.** Some of Paulina's answers contradicted others that she gave and it appeared to this Court that she was familiar with many of the questions and had discussed her responses with someone prior to the hearing. *See Blondin v. Dubois,* 238 F.3d at 167 (noting that the district court "could not rule out the possibility that [the child] 'may have been coached' ").

**13.** A petition in this case is currently pending before the Second Circuit for rehearing *en banc.*

**14.** There have been four decisions in the case *Blondin v. Dubois.* The first three are cited in the most recent Second Circuit decision,

*Blondin v. Dubois,* 238 F.3d 153 (2d Cir. 2001), as follows: the first district court decision, *Blondin v. Dubois,* 19 F.Supp.2d 123 (S.D.N.Y.1998) (*"Blondin I"*); the first appeal, *Blondin v. Dubois,* 189 F.3d 240 (2d Cir.1999) (*"Blondin II"*); and the remand, *Blondin v. Dubois,* 78 F.Supp.2d 283 (S.D.N.Y.2000) (*"Blondin III"*).

**15.** The Second Circuit has held that the Perez Vera Report is an "authoritative source" for interpreting the Convention and "the official history" of the Convention. *See id.* n. 3; *Blondin v. Dubois,* 189 F.3d at 246 n. 5.

*David S. v. Zamira S.,* 151 Misc.2d 630, 633, 574 N.Y.S.2d 429, 431 (Fam. Ct. Kings County 1991). Under ICARA, United States district courts are given concurrent original jurisdiction with the state courts over petitions filed under the Convention. 42 U.S.C. § 11603(a); *see Norden–Powers v. Beveridge,* 125 F.Supp.2d 634, 637 (E.D.N.Y.2000); *Wojcik v. Wojcik,* 959 F.Supp. at 417.[16] ICARA establishes specific burdens of proof for the parent seeking the return of the child under the Convention and for the parent who is opposed to the child's return. The petitioner must first establish "by a preponderance of the evidence ... that the child has been wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1)(A). In order to show that the removal or retention was "wrongful," the petitioner must establish that the removal or retention:

a) ... is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3, 51 Fed.Reg. at 10,498; *see also Croll v. Croll,* 229 F.3d at 137.

■ Once a petitioner has established that the retention or removal was wrongful and in violation of the petitioner's custodial rights, "the court must order the child's return to the country of habitual residence unless the respondent demonstrates that one of four narrow exceptions apply." *Croll v. Croll,* 229 F.3d at 138; *see* 42 U.S.C. § 11601(a)(4). Two of these exceptions must be proved by clear and convincing evidence: (1) that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," pursuant to Article 13(b) of the Convention; or (2) that the child's return "would not be permitted by the fundamental principles ... relating to the protection of human rights and fundamental freedoms," pursuant to Article 20 of the Convention. *See Blondin v. Dubois,* 189 F.3d at 245.

■ The other two exceptions set forth in the Convention need be proved only by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2)(B). These exceptions to the presumption of repatriation are either that: (1) "judicial proceedings were not commenced within one year of the child's abduction and the child is settled in [her] new environment, pursuant to Article 12 of the Convention;" or (2) that the petitioner was "not actually exercising custody rights at the time of the removal, pursuant to Article 13(a) of the Convention." *Blondin v. Dubois,* 189 F.3d at 245–46 (citing 42 U.S.C. § 11603(e)(2)(B)); *Wojcik v. Wojcik,* 959 F.Supp. at 421.

■ These exceptions have been defined as "narrow," 42 U.S.C. § 11601(a)(4), and "do not authorize a court to exceed its Hague Convention function by making determinations, such as who is the better parent, that remain within the purview of

---

**16.** Respondent initially argued that the petition should be transferred to Family Court where the judges are more accustomed to dealing with custody related matters. Respondent's motion was denied by this Court in light of the Congressional determination to grant concurrent jurisdiction to state and federal courts. Moreover, as noted, this Court is not being asked to decide the issue of custody, but rather is limited to determining which jurisdiction should be deciding the issue of custody.

the court with plenary jurisdiction over the question." *Blondin v. Dubois*, 189 F.3d at 246. Moreover, while the Second Circuit has stated that "if more than one year has passed, a 'demonstration that the child is now settled in its new environment' may be a *sufficient* ground for refusing to order repatriation" under Article 12 *Blondin v. Dubois*, 238 F.3d at 164 (emphasis in the original), the court has also held that even when one of the exceptions has been established, "the district court is not necessarily bound to allow the child to remain with the abducting parent." *Id.* at 246 n. 4 (citing *Friedrich v. Friedrich*, 78 F.3d at 1067 (holding that "a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention")).

■ In addition, the Convention permits the court to take into account the preferences of an older child. *See* Hague Convention, art. 13, 51 Fed.Reg. at 10,499; *Friedrich v. Friedrich*, 78 F.3d at 1067 n. 8; *In re Robinson*, 983 F.Supp. 1339, 1342 (D.Col.1997). "The court may 'refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.'" *Blondin v. Dubois*, 189 F.3d at 246 n. 3 (quoting the Convention, art. 13). According to the Second Circuit, this "unnumbered provision of Article 13 provides a *separate* ground for repatriation and ... a court may refuse repatriation *solely* on the basis of a considered objection to returning by a sufficiently mature child." *Blondin v. Dubois*, 238 F.3d at 166 (emphasis in original). The Second Circuit also concluded that "a court may consider a younger child's testimony as part of a broader analysis under Article 13(b)." *Id.* at 166.

2. *Analysis—Petitioner's Burden*

■ Turning to the petition in this case, this Court finds that petitioner, Mr. Koc, has satisfied his burden of proving by a preponderance of the evidence that his daughter was wrongfully retained here in the United States. First, it is undisputed that Paulina was a habitual resident of Poland at the time of her wrongful retention. (12/1/00 Tr. at 26). Both of Paulina's parents are Polish citizens, as is Paulina, and with the exception of a brief two-week trip to the United States with her mother in 1997, Paulina had lived continuously in Poland for most of her life. *See Wojcik v. Wojcik*, 959 F.Supp. at 417 (finding habitual residence where the children were born in France, the parents were married in France, and the children had lived in France continuously until their removal); *see also Friedrich v. Friedrich*, 983 F.2d at 1402 (finding habitual residence where the child was born in Germany and resided there exclusively until his removal). Indeed, respondent does not even attempt to challenge that assertion.

■ Second, there does not appear to be any question that both Mr. and Mrs. Koc have custody over Paulina. Under the Hague Convention, custody rights are defined as "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5; *see also Norden–Powers v. Beveridge*, 125 F.Supp.2d at 640. The Second Circuit in *Croll* further defined the term "custody" as including "the primary duty and ability to choose and give sustenance, shelter, clothing, moral and spiritual guidance, medical attention, education, etc., or the (revocable) selection of other people or institutions to give these things." 229 F.3d at 138.

In the instant case, immediately before her trip to the United States with her

mother, Paulina had lived with both her mother and father in the same residence in Poland, and the testimony clearly establishes that Mr. Koc exercised his parental rights before the child was wrongfully retained in the United States. *See Wojcik v. Wojcik*, 959 F.Supp. at 417. According to his testimony, which was not disputed, Mr. Koc was the exclusive caregiver for the child during the four to five month period in 1997 when Ms. Koc came to the United States by herself. (12/1/00 Tr. at 27, 31–32). Here, unlike many of the reported cases, there has been no divorce decree nor has there been a determination of custody over the child. *Cf., e.g., Croll v. Croll*, 229 F.3d at 135 (divorce proceedings initiated and custody order issued by Hong Kong court); *Wojcik v. Wojcik*, 959 F.Supp. at 415 (divorce proceedings initiated and "provisional" custodial ruling issued by French court); *Friedrich v. Friedrich*, 78 F.3d at 1063 (custody awarded to petitioner by German court).

However, even though there may be no judicial or administrative determinations of custody in this case, " 'rights of custody' also arise by operation of [Polish] law." *Norden–Powers v. Beveridge*, 125 F.Supp.2d at 639 (citing Hague Convention, art. 3). Petitioner has submitted an affidavit from a Polish Advocate, Marcin Gmaj, stating that under Polish law, the biological father of a Polish child under the age of 18 who is married to the child's biological mother, who resides with both mother and child, and whose custody has not been limited by a judgment of the Polish court or through a legal separation, has shared custody of the child. (Gmaj Aff. dated Dec. 21, 2000, Ex. B to Letter of Edith L. Josephson, Esq., dated Dec. 22, 2000 ("Josephson Letter")). A second letter submitted by petitioner from Leszek Kuziak, Judge of the Ministry of Justice in Poland, states that pursuant to Article 97 of the Polish Family Law, when parental authority is vested jointly in both parents, each has the right to decide "matters essential to the child" including the "child's permanent/temporary place of residence." (Ex. C. to Josephson's Letter). According to Judge Kuziak, "[t]he retention is considered wrongful if it is made by one of the parents without the arrangement [of the other] parent." (*Id.*)

Finally, the evidence clearly establishes that the child was wrongfully retained here in the United States by her mother. While Mr. Koc may have acquiesced in Ms. Koc's decision to bring Paulina to the United States for vacation, the clear intent of both parents was that Paulina would be returned to Poland in time to start school in the fall. (12/1/00 Tr. at 7, 17, 26–27). Ms. Koc conceded that until the end of August 1998, she had intended to return to Poland with the child and represented those same intentions to her husband. (*Id.* at 17).

Accordingly, this Court finds that the child was wrongfully retained in the United States, in violation of the custodial rights of the petitioner under the laws of Poland where the child was habitually resident immediately before the wrongful retention and that petitioner actually exercised his parental rights and would have continued to do so had the child not been wrongfully retained. *See* Convention, art. 3, 51 Fed.Reg. at 10,498.

### 3. *Defenses*

Having found that petitioner has carried his burden of showing wrongful retention under the Convention and ICARA, this Court must next consider respondent's claim that this case falls within one of the exceptions set forth in the Convention. In this case, there is no claim that the child's return to Poland would be contrary to principles of this country regarding the

protection of human rights or fundamental freedoms. Hague Convention, art. 20, 51 Fed.Reg. at 10,500; *see In re Robinson,* 983 F.Supp. at 1342–43. However, respondent appears to raise an argument under both Articles 13(a) and 12 of the Convention.

a. *Acquiescence—Article 13(a)*

Respondent first contends that because the petitioner filed an application with the Polish Central Authority on December 29, 1999 for a "right of access" prior to filing the instant petition, he relinquished his custodial rights, is precluded from now seeking Paulina's return to Poland, and may only be awarded access or visitation rights. (Answer ¶ 16; Affirmation of Mark Broydes, Esq., dated 12/26/00 ("Broydes Aff.") at 1–4). Respondent argues that an application to the Polish Central Authority is a prerequisite to bringing this action and that petitioner's counsel had no authority to initiate this proceeding in the United States. (*Id.*) Respondent's counsel also states that Poland's Ministry of Justice:

> rejected [Mr. Koc's] custody application pursuant to its powers under Article 27 of the Convention and told Petitioner that he would be allowed to proceed only to seek visitation/access … For this case to be a proceeding seeking to send child of the parties for a custody trial, this federal court would have to overturn decision of Polish Ministry of Justice, or it would have to order said Ministry to issue a decision allowing this Court to issue an order sending Paulina to Poland.

(*Id.* at 3–4). Respondent, however, cities no authority to support her claim that an application to the Polish Central Authority is a prerequisite to suit or that the nature of petitioner's application to the Central Authority bars him from seeking Paulina's return in this Court.

In examining the merits of respondent's claim that petitioner is barred by the Polish Central Authority's decision from seeking a return of Paulina to Poland, this Court looks to the nature of the responsibilities and functions delegated to the Central Authorities under the Convention. The Convention explicitly provides for the designation of a Central Authority in each Contracting State with the express purpose of cooperating with the Central Authorities in other states and the relevant authorities within their own state "to secure the prompt return of children and to achieve the other objects of this Convention." Convention, arts. 6, 7, 51 Fed.Reg. at 10,498. The role of the Central Authority is to take measures:

> (a) to discover the whereabouts [of the child] … (b) to prevent further harm to the child …; (c) to secure the voluntary return of the child or to bring about an amicable resolution of the issues; (d) to exchange … information relating to the social background of the child; (e) to provide information … as to the law of their State …; (f) to initiate or facilitate the institution of judicial or administrative proceedings with a view to obtaining the return of the child and, in a proper case, to make arrangements for organizing or securing the effective exercise of access; (g) … to provide or facilitate the provision of legal aid and advice, including the participation of legal counsel …; (h) to provide such administrative arrangements as may be necessary and appropriate to secure the safe return of the child; (i) to keep each other informed with respect to the operation of this Convention and, as far as possible, to eliminate any obstacles to its application.

Convention, art. 7, 51 Fed.Reg. at 10,498.

■ While the Convention contemplates an active role on the part of the

Central Authorities in each of the Contracting States in assisting in the coordination and enforcement of the Convention, it is clear that the ultimate adjudicatory function rests with the judicial or administrative authorities of the Contracting States who are responsible for deciding petitions under the Convention "expeditiously." Convention, art. 11, 51 Fed.Reg. at 10,499. The Central Authority may request a statement of the reasons for delay if a judicial or administrative authority has not reached a decision within six weeks of the date of commencement of the proceedings, *id.* but there is no provision in the Convention that delegates the authority to decide a petition to the Central Authority. *See Wojcik v. Wojcik,* 959 F.Supp. at 419 (holding that "[s]ince it is the judicial or administrative authority 'concerned' that orders the child returned, only an authority with the power to order a child's return can be a judicial or administrative authority under Article 12. The Convention has a chapter devoted solely to the Central Authorities ... in which no mention is made of the power to order a child's return").

Article 27 of the Convention does allow a Central Authority to reject an application "[w]hen it is manifest that the requirements of this Convention are not fulfilled or that the application is not well founded," and the Central Authority is obligated to inform the applicant of its reasons. Convention, art. 27, 51 Fed.Reg. at 10,500. However, there is nothing in the Convention that precludes an applicant whose petition is rejected by a Central Authority from filing a new petition. Indeed, Article 8 of the Convention explicitly permits an applicant to apply "either to the Central Authority of the child's habitual residence or to the Central Authority of any other Contracting State," *id.,* art. 8, 51 Fed.Reg. at 10,498, and Article 29 provides that the Convention "shall not preclude any person ... from applying directly to the judicial or administrative authorities of a Contracting State, whether or not under the provisions of this Convention." *Id.,* art. 29, 51 Fed.Reg. at 10,501.

■ The evidence in this case is that Mr. Koc went to the Polish Central Authority in December 1999 and told them that he "wanted the child to be returned to me." (12/1/00 Tr. at 33). According to Mr. Koc, the Polish Central Authority apparently advised him at that time that "there was a small probability" of having the child returned (*id.*), and so he filed an application styled "Request for Exercise of Right of Access and Accommodation." (Letter of Edith L. Josephson, Esq., dated 12/22/00, Ex. D). He testified that "I was trying to get something because at that time I had limited contact, even telephone contact. I was—I attempted to obtain whatever I was able to obtain." (12/1/00 Tr. at 34).

Contrary to respondent's counsel's assertion, there is no evidence before this Court that the Polish Ministry of Justice issued a decision that Mr. Koc "would be allowed to proceed only to seek visitations/access." (Broydes Aff. at 3). Indeed, there is no evidence that the Polish Central Authority exercised its authority to reject Mr. Koc's application under Article 27. Rather, the evidence demonstrates that the Polish Central Authority advised Mr. Koc to seek access rights because of a belief that he would have a better chance at succeeding in an access claim than in a petition for return of the child. In rendering such advice, however, the Polish Central Authority had no authority under the Convention to render a judgment which would have a preclusive effect on this Court.

Moreover, there is evidence that petitioner, with the assistance of the Central Authority, attempted to resolve the matter

out of court pursuant to Article 7 of the Convention. According to the letter of Edith Josephson dated December 22, 2000, the Polish Central Authority contacted the United States State Department which, in conjunction with the National Center for Missing and Exploited Children (the "National Center"), attempted to work out a voluntary resolution of the matter. (Josephson Letter at 5). When those efforts proved unsuccessful, the National Center referred the matter to Dewey Ballentine, LLP [17] which again attempted on behalf of petitioner to work out a voluntary visitation arrangement with the respondent. It was after counsel for respondent indicated that the respondent would not allow visitation unless there was a court order that petitioner filed this action seeking the child's return to Poland. (*Id.*)

Petitioner's efforts to obtain voluntary visitation rights prior to filing this petition do not constitute "acquiescence" under the Convention so as to preclude his right to proceed in this Court. *See Pesin v. Osorio Rodriguez,* 77 F.Supp.2d 1277, 1290 (S.D.Fla.1999) (holding that a father who allowed his children to remain in Florida while he made "serious and concerted efforts at reconciliation" prior to filing a petition did not acquiesce within the meaning of the Convention); *see also* Linda Silberman, *Hague Convention on International Children Abduction: A Brief Overview and Case Law Analysis,* 28 Fam. L.Q. 9, 26 (1994) (noting that "as a general rule courts should be careful not to translate negotiation into acquiescence. To do so could lead lawyers to refuse to talk or negotiate at all for fear of creating the impression of acquiescence, and could encourage litigation at the expense of a more amiable resolution"). The Sixth Circuit in *Friedrich v. Friedrich* defined acquiescence under the Convention as requiring "either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." 78 F.3d at 1070; *see also Pesin v. Osorio Rodriguez,* 77 F.Supp.2d at 1288 (noting that "acquiescence is a question of the actual subjective intention of the wronged parent, not of the outside world's perception of his intentions") (quotation marks and citation omitted).

Here, it is clear from all of his actions, that petitioner's intent was to have his daughter returned to him or, if that was not possible, to have visitation rights with the child. The testimony of both parents established that upon first learning of his wife's decision to remain in the United States, Mr. Koc "demanded" the return of the child to Poland. He attempted unsuccessfully on four occasions to get a visa to come to the United States and attempted to correspond with his wife and daughter through her relatives in the United States. It is equally apparent to this Court that Ms. Koc attempted to hide the child, moving from her parents' home to three new locations in a period of less than two years, making personal service difficult and adding to the delay in bringing these proceedings. Although Ms. Koc claimed that Mr. Koc never asked for her address, this Court finds that such a query would have been futile, given the difficulties experi-

---

17. Counsel for respondent argues that Dewey Ballentine lacks authorization to bring this action and that the firm violated attorney ethical and disciplinary rules. (Broydes Aff. at 2–4). This Court is unaware of any ethical rules that have been violated. To the contrary, petitioner appeared before this Court, signed the papers instituting this action, and there is no evidence to suggest that Dewey Ballentine's authority was limited by their client in any way. Moreover, nothing in the Convention itself or even in the "authorization" referred to by respondent limits counsel's authority to bring this action.

enced by petitioner's counsel in attempting to serve Ms. Koc, necessitating an order from this Court authorizing substituted service on Ms. Koc's attorney. (See Order dated Oct. 13, 2000).

In his quest for his child, petitioner sought assistance from the Polish Central Authority and then sought to negotiate an arrangement, hoping that his wife might eventually agree to return to Poland or at least allow him to see the child. (Josephson Letter at 5). The fact that the Central Authority may have given petitioner certain advice did not preclude him from commencing this action through counsel. Nothing in petitioner's behavior or in his sworn testimony to this Court suggests that he ever acquiesced in the wrongful retention of the child, nor is there any reason to limit his request at this time to a request for access since the suit filed in this Court seeks a return of the child to Poland for a custody determination. Thus, this Court concludes that there is insufficient evidence to support a claim under the exception set forth in Article 13(a) that petitioner failed to exercise his custody rights or acquiesced in the retention of the child in this country.

b. *"Well–Settled" Exception—Article 12*

Respondent raises another argument pursuant to Article 12 of the Convention, contending that the petition should be denied because Paulina has been in the United States for more than one year and is now "settled" in her new home.

 Although there is no dispute that Paulina has been in the United States for more than one year, it is clear that respondent must show by a preponderance of the evidence that the child is " 'in fact settled in or connected to the new environment so that, at least inferentially, return would be disruptive with likely harmful effects.... [T]here must be " 'substantial evidence of the child's significant connections." ' "

*Zuker v. Andrews,* 2 F.Supp.2d 134, 141 (D.Mass.1998) (quoting *In re Robinson,* 983 F.Supp. 1339, 1345 (D.Colo.1997) (quoting Public Notice 957, 51 Fed.Reg. at 10,509)), *aff'd,* 181 F.3d 81 (1st Cir.), *cert. denied,* 528 U.S. 1048, 120 S.Ct. 585, 145 L.Ed.2d 486 (1999). Although "settled" is not a legal term of art, nor does the Convention or ICARA define "settled," the reference to "significant connections" reflects the objective of the Convention to have children promptly returned and to have custody matters decided in the state with the strongest interest in the child's care, protection, training and personal relationships. *See generally In re Robinson,* 983 F.Supp. at 1344–45; *see also Norden–Powers v. Beveridge,* 125 F.Supp.2d at 638 (commenting on "the wisdom of the Hague Convention that issues regarding custody should be decided by the courts of the country of habitual residence, rather than, as here, a court acting in a country the Children are visiting on extended holiday").

 Among the factors considered by the courts in determining whether a child is settled in her new environment are the age of the child, the stability of the child's residence in the new environment, whether the child attends school or day care consistently, whether the child attends church regularly, the stability of the mother's employment, and whether the child has friends and relatives in the new area. *See Wojcik v. Wojcik,* 959 F.Supp. at 421; *see also In re Robinson,* 983 F.Supp. at 1345–1346. A more "comfortable material existence" does not mean that the child is well settled. *Lops v. Lops,* 140 F.3d at 946. Moreover, the Second Circuit has noted that when considering whether a child is well settled as part of the analysis under Article 13(b) of the Convention, "[t]he ordinary disruptions necessarily accompanying [repatriation] would not by

themselves constitute [a grave risk of harm]." *Blondin v. Dubois*, 238 F.3d at 164; *see also Walsh v. Walsh*, 221 F.3d at 220 n. 14; *Friedrich v. Friedrich*, 78 F.3d at 1068.

In *Wojcik*, the court based its finding that the children were "settled" on the fact that they had been in this country for eighteen months, living eight months with the mother's brother and then moving to their own home where they continued to reside. *Wojcik v. Wojcik*, 959 F.Supp. at 421. The Court also took notice of the fact that they attended "school and day care consistently; . . . had friends and relatives in the area; . . . attended church regularly; and the mother had stable employment with the same employer for more than a year." *Id.* Similarly, in *In re Robinson*, the children had lived in the same area for 22 months prior to the commencement of the action, were actively involved with the respondent's extended family, were doing well in school, actively participated in extracurricular activities, and had friends in school and elsewhere. Thus, the court found that they had adjusted well and were "settled" in their new community. 983 F.Supp. at 1346. *See also Zuker v. Andrews*, 2 F.Supp.2d at 141 (finding the child settled where he had attended the same day care center despite the mother's move to a new apartment, had "thrived academically and socially," had playdates at his home and at the homes of friends, and had established relationships with his teachers and his grandmother who he saw two or three times a week).

By contrast, the court in *In re Petition for Writ of Habeas Corpus for Coffield*, found that the respondent had failed to carry his burden of establishing that the child was settled. 96 Ohio App.3d 52, 58, 644 N.E.2d 662, 666 (1994). The evidence before the court in the *Coffield* case estab-

lished that while the child had made friends, respondent had exposed the child "only to a limited group of friends and relatives," a group "limited to the children of appellant's prior acquaintances, i.e., people whom appellant could trust." *Id.* The evidence showed that while three years had elapsed since the abduction, the child had only been living in Ohio for ten months, had not been enrolled in any organized activities, and had failed to develop the connections to the community which a normal child of his age would be expected to develop. *Id.; see also Lops v. Lops*, 140 F.3d 927, 946 (11th Cir.1998) (finding the children not settled even though they attended school, where the father had taken steps to conceal the children's whereabouts and had illegally concealed his identity from authorities), *cert. denied*, 525 U.S. 1158, 119 S.Ct. 1068, 143 L.Ed.2d 71 (1999).

 Here Paulina has been in this country for two and a half years, since May 1998. Yet in that same time, she has lived in at least three different locations and attended three different schools. Although it is unclear from the testimony exactly how long Paulina has been residing at her current address in Queens, it is clearly less than a year.[18] Similarly, she has been at the school she is currently attending for only four months, beginning the third grade there this fall. While she is doing well academically and her English is excellent, this may be more of a tribute to the resilience and intelligence of a bright little girl. She does not attend extracurricular school-related activities, although it appears that she may now be attending religious classes once a week since October. She told this Court that she does not attend church on a regular basis because "I can't find one." (12/19/00

---

**18.** *See* fn. 6 at 142, *supra*.

In Camera Tr. at 7). Although she has a best friend in school, she does not go to other friends' homes, nor do they come to hers. (*Id.* at 4). Ms. Koc explained to this Court that Paulina does not socialize with her classmates outside of school because "she does not have Polish children in that class." (12/1/00 Tr. at 20). Similarly, Paulina does not seem to have friends in the neighborhood. (12/19/00 In Camera Tr. at 4–5). However, according to her mother, Paulina meets children her own age when Ms. Koc takes her to work. (12/1/00 Tr. at 20; *see also* 12/19/00 In Camera Tr. at 9). While Paulina appears to have contact with her mother's relatives here in the United States—grandparents, aunts, uncles and cousins—it is equally clear that she has beloved relatives in Poland as well. She was clearly delighted to see her Polish cousins who she had not seen since coming to the United States. It is also clear that Paulina had many friends in Poland, who still ask after her.[19]

Weighing these factors alone, this Court finds that respondent has failed to carry her burden of showing that the child is settled in her new environment. As a consequence of moving to three new schools and three new homes in less than three years, Paulina has few friends here and knows that she must push herself: "Its hard. I just can't be shy and I gotta just ask [ui]." (12/19/00 In Camera Tr. at 3).

However, this Court notes that there are other factors which suggest that the child is not settled. First, her immigration status and the status of her mother in this country is uncertain. They have both admittedly overstayed their visas and are now here illegally. The fact that the Immigration Service may not be looking to deport them at this time does not, in any way, guarantee that that position will not change in the future or that Paulina and her mother will ultimately become legal permanent residents of this country.[20] In addition, Ms. Koc's employment history does not impress this Court as being one of great stability. Although she teaches piano lessons, Ms. Koc is not currently employed by an organization and relies on recommendations from her current clients to obtain new clients. She admittedly pays no taxes and yet is reliant upon the public services of this state and on the financial assistance of her parents.

Finally, because of the nature of her status in this country, Ms. Koc has made it virtually impossible for Paulina to see her father if she remains in this country. Mr. Koc has been denied a visa to come to this country on four separate occasions due to his wife's and daughter's uncertain immigration status (12/1/00 Tr. at 28–29, 36; Koc Decl. ¶ 9), and Ms. Koc has expressed the concern that if she were to return to Poland for any reason, she might not be permitted to reenter the United States. (*See* Answer ¶ 6).

In summary, this Court finds that respondent has failed to carry her burden of showing by a preponderance of the evi-

---

**19.** This Court's decision does not rest solely upon the statements expressed by this remarkable eight year-old girl, *see Blondin v. Dubois,* 238 F.3d at 166–68, but the Court did consider her testimony regarding her life here and in Poland as part of the broader analysis under Article 12. *Cf. id.* at 166–67.

**20.** Although respondent's friend, Ms. Kopec, offered testimony to the effect that she would be willing to hire Ms. Koc and sponsor her for a work permit, no application has been made at this time and Ms. Koc has not even decided if she will accept the offer. Similarly, the fact that some of Ms. Koc's relatives may be here legally and may be legal residents does not mean that Ms. Koc and Paulina will necessarily be granted such status.

dence that the child is "well settled" here in the United States. *See Blondin v. Dubois*, 189 F.3d at 247.

c. *Grave Risk of Harm—Article 13(b)*

▮ Finally, this Court notes that in her answer to the petition, dated November 22, 2000, respondent invoked Article 13(b) as a defense, claiming that returning Paulina to Poland would subject the child to psychological harm. (*See* Answer ¶ 24). However, there was no evidence presented during the hearing before this Court to support a claim under Article 13(b) of the Convention that the child's return would expose her to a grave risk of physical or psychological harm or otherwise place her "in an intolerable situation." *Id.*, art. 13(b), 51 Fed.Reg. at 10,499. The claim was only vaguely referred to in respondent's counsel's post-hearing submission, where he alleges that returning Paulina to Poland would "plunge her ... again into a rank poverty, a home in which Paulina could observe her father beating his [sic] mother, a place where the respondent could not provide her child with proper education, food, clothes and the environment free from blackmail, threats and nationalism." (Broydes Aff. at 8). As such, in the absence of any supporting evidence, the Court deems the Article 13(b) defense to have been abandoned by respondent, who now appears to be asserting only defenses that the child is settled under Article 12 and that petitioner has abandoned his custodial rights under Article 13(a).

▮ In the event that respondent still asserts the Article 13(b) defense, neither the potential separation of Paulina from her mother if she is returned to Poland (*see* Answer ¶ 24), nor the allegedly inferior economic and educational opportunities in Poland rise to the level of psychological harm or intolerable situation envisioned by Article 13(b). *See Blondin v. Dubois*, 238 F.3d at 161–62, 165; *Whallon v. Lynn*, 230

F.3d 450, 460 (1st Cir.2000); *Walsh v. Walsh*, 221 F.3d 204, 220 n. 14 (1st Cir. 2000); *Friedrich v. Friedrich*, 78 F.3d at 1068.

The Court notes that apart from the absence of any evidence to support these claims, "[t]he level of risk and danger required to trigger this exception [under Article 13(b) ] has consistently been held to be very high." *Norden–Powers v. Beveridge*, 125 F.Supp.2d at 640 (citing *Blondin v. Dubois*, 189 F.3d at 249). The Second Circuit has stated that:

A review of deliberations on the Convention reveals that "intolerable situation" was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State. An example of an "intolerable situation" is one in which a custodial parent sexually abuses a child.

*Blondin v. Dubois*, 238 F.3d at 162 (quoting 51 Fed.Reg. at 10510 n. 10). Indeed, even where there has been convincing evidence of physical and emotional abuse, the court has required further inquiry into whether any arrangements can be made to repatriate the children while at the same time protecting them from further psychological and physical harm. *See Blondin v. Dubois*, 238 F.3d at 156 (noting that the court had previously remanded in these circumstances for further proceedings "because the aim of the Convention is to ensure the 'prompt return' of abducted children"); *see also Blondin v. Dubois*, 78 F.Supp.2d at 290–93 (finding, on uncontested expert testimony, that the children would suffer from post traumatic stress disorder upon repatriation), *aff'd*, 238 F.3d at 168. Thus, as the court in *Blondin* noted:

At one end of the spectrum are those situations where repatriation might

cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations where the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do.

*Blondin v. Dubois,* 238 F.3d at 162.

In this case, respondent has failed to carry her burden of proving by clear and convincing evidence that Paulina would suffer physical or psychological harm or be placed in an intolerable situation if she was returned to Poland. Specifically, with respect to the claims of abuse by petitioner, there was not one shred of evidence or testimony that even hinted at the abuse alleged by Mr. Broydes.[21] Both Ms. Koc and her mother, Irena Krotoszynska, had ample opportunity to assert these claims during their testimony at this Court's hearings on December 1 and December 19, 2000, but neither of them mentioned these allegations or even the possibility of abuse. Indeed, counsel for respondent failed to raise these issues in his cross-examination of Mr. Koc, waiting until the after conclusion of the hearing to make these unsubstantiated allegations at a time when petitioner was no longer able to respond. *Cf. Blondin v. Dubois,* 238 F.3d 153 (detailing extensive testimony and evidence of abuse). Furthermore, even counsel's unsubstantiated charge of physical abuse does not refer to the child and only appears to relate to Ms. Koc. (Broydes Aff. at 2).

Moreover, to the extent that respondent asserts that an order of this Court returning Paulina to Poland would cause Paulina "grave harm" because she would be denied "the benefit of motherly love" (Broydes Aff. at 9), respondent ignores the fact that this is a consequence of choices made by respondent and not one that this Court may consider in determining the questions presented here. *See Friedrich v. Friedrich,* 78 F.3d at 1068.

Finally, to the extent that respondent has presented evidence to suggest that Paulina may be better off economically in the United States than she would be in Poland, there is no evidence in the record to support the charge that she would be living in "rank poverty." To the contrary, the evidence demonstrates that Mr. Koc is highly educated, has steady employment in a respected profession as a teacher, and has an apartment with a room for Paulina where she will be able to reside if returned to Poland. (12/1/00 Tr. at 26, 30). Even if the Court were to credit the respondent's claims of economic inequality, that alone does not constitute the type of "intolerable situation" envisioned by the Convention. *See Blondin v. Dubois,* 238 F.3d at 161.

In sum, this Court finds that petitioner has carried his burden of showing that the child was wrongfully retained in this country and respondent has failed to show that any of the exceptions apply here. Accordingly, it is respectfully recommended that an order issue granting the petition of Andrzej Koc and returning Paulina to her home country of Poland.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the under-

---

21. Counsel for respondent further alleged that Ms. Koc's motives for not returning to Poland "were a mixture of a desire to break with her husband who was physically abusive to her, and, in addition, a person of low moral character, an informer and a blackmailer." (Broydes Aff. at 2). Again, there is no evidence in the record before this Court to support this charge.

signed, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Small v. Secretary of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to mail copies of this Report and Recommendation to the parties.

**SO ORDERED.**